STANLEY C. ORRISCH AND GERTA E. ORRISCH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3743–69. Filed December 2, 1970.

*Gino P. Cecchi*, for the petitioners.
*Vernon R. Balmes*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' income tax for 1966 and 1967 in the respective amounts of $2,814.19 and $3,018.11. The only issue for decision is whether an amendment to a partnership agreement allocating to petitioners the entire amount of the depreciation deduction allowable on two buildings owned by the partnership was made for the principal purpose of avoidance of tax within the meaning of section 704(b).[1]

FINDINGS OF FACT

Stanley C. Orrisch (hereinafter sometimes referred to as Orrisch) and Gerta E. Orrisch were husband and wife until a judgment of

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise noted.

divorce was entered by the Superior Court of San Mateo County, Calif., on May 22, 1969. They filed joint Federal income tax returns for 1966 and 1967 with the district director of internal revenue, San Francisco, Calif. At the time they filed their petition, they were legal residents of Burlingame, Calif.

In May of 1963, Domonick J. and Elaine J. Crisafi (hereinafter the Crisafis) and petitioners formed a partnership to purchase and operate two apartment houses, one located at 1255 Taylor Street, San Francisco, and the other at 600 Ansel Road, Burlingame, Calif. The cost of the Taylor Street property was $229,011.08, and of the Ansel Road property was $155,974.90. The purchase of each property was financed principally by a secured loan. Petitioners and the Crisafis initially contributed to the partnership cash in the amounts of $26,500 and $12,500, respectively. During 1964 and 1965 petitioners and the Crisafis each contributed additional cash in the amounts of $8,800. Under the partnership agreement, which was not in writing, they agreed to share equally the profits and losses from the venture.

During each of the years 1963, 1964, and 1965, the partnership suffered losses, attributable in part to the acceleration of depreciation—the deduction was computed on the basis of 150 percent of straight-line depreciation. The amounts of the depreciation deductions, the reported loss for each of the 3 years as reflected in the partnership returns, and the amounts of each partner's share of the losses are as follows:

| Year | Depreciation deducted | Total loss | Each partner's share of the losses—50 percent of the total loss |
|---|---|---|---|
| 1963 | $9,886.20 | $9,716.14 | $4,858.07 |
| 1964 | 21,051.95 | 17,812.33 | [1] 8,906.17 |
| 1965 | 19,894.24 | 18,952.59 | [1] 9,476.30 |

[1] The amounts of the losses allocated to the Crisafis for 1964 and 1965 were actually $8,906.16 and $9,476.29, respectively.

Petitioners and the Crisafis respectively reported in their individual income tax returns for these years the partnership losses allocated to them.

Petitioners enjoyed substantial amounts of income from several sources, the principal one being a nautical equipment sales and repair business. In their joint income tax returns for 1963, 1964, and 1965, petitioners reported taxable income in the respective amounts of $10,462.70, $5,898.85, and $50,332, together with taxes thereon in the amounts of $2,320.30, $1,059.80, and $12,834.

The Crisafis were also engaged in other business endeavors, principally an insurance brokerage business. They owned other real property, however, from which they realized losses, attributable largely to

substantial depreciation deductions. In their joint income tax returns for 1963, 1964, and 1965, they reported no net taxable income.

Early in 1966, petitioners and the Crisafis orally agreed that, for 1966 and subsequent years, the entire amount of the partnership's depreciation deductions would be specially allocated to petitioners, and that the gain or loss from the partnership's business, computed without regard to any deduction for depreciation, would be divided equally. They further agreed that, in the event the partnership property was sold at a gain, the specially allocated depreciation would be "charged back" to petitioner's capital account and petitioners would pay the tax on the gain attributable thereto.

The operating results of the partnership for 1966 and 1967 as reflected in the partnership returns were as follows:

| Year | Depreciation deducted | Loss (including depreciation) | Gain (or loss) without regard to depreciation |
| --- | --- | --- | --- |
| 1966 | $18,412.00 | $19,396.00 | ($984.00) |
| 1967 | 17,180.75 | 16,560.78 | 619.97 |

The partnership returns for these years show that, taking into account the special arrangement as to depreciation, losses in the amounts of $18,904 and $16,870.76 were allocated to petitioners for 1966 and 1967, respectively, and petitioners claimed these amounts as deductions in their joint income tax returns for those years. The partnership returns reported distributions to the Crisafis in the form of a $492 loss for 1966 and a $309.98 gain for 1967. The Crisafis' joint income tax returns reflected that they had no net taxable income for either 1966 or 1967.

The net capital contributions, allocations of profits, losses and depreciation, and ending balances of the capital accounts, of the Orrisch-Crisafi partnership from May 1963 through December 31, 1967, were as follows:

| | *Petitioners'* | *Crisafis'* |
| --- | --- | --- |
| Excess of capital contributions over withdrawals during 1963 | $26,655.55 | $12,655.54 |
| Allocation of 1963 loss | (4,858.07) | (4,858.07) |
| Balance 12/31/63 | 21,797.48 | 7,797.47 |
| Excess of capital contributions over withdrawals during 1964 | 4,537.50 | 3,537.50 |
| Allocation of 1964 loss | (8,906.17) | (8,906.16) |
| Balance 12/31/64 | 17,428.81 | 2,428.81 |
| Excess of capital contributions over withdrawals during 1965 | 4,337.50 | 5,337.50 |
| Allocation of 1965 loss | (9,476.30) | (9,476.29) |
| Balance 12/31/65 | 12,290.01 | (1,709.98) |

|  | Petitioners' | Crisafis' |
|---|---|---|
| Excess of capital contributions over withdrawals during 1966 | $2, 610. 00 | $6, 018. 00 |
| Allocation of 1966 loss before depreciation | (492. 00) | (492. 00) |
| Allocation of depreciation | (18, 412. 00) | 0 |
| Balance 12/31/66 | (4, 003. 99) | 3, 816. 02 |
| Excess of withdrawals over capital contributions during 1967 | (4, 312. 36) | (3, 720. 35) |
| Allocation of 1967 profit before depreciation | 309. 99 | 309. 98 |
| Allocation of depreciation | (17, 180. 75) | 0 |
| Balance 12/31/67 | (25, 187. 11) | 405. 65 |

In May of 1968, before petitioners Stanley C. Orrisch and Greta E. Orrisch were divorced, they entered into a marital property settlement agreement which, as part of paragraph 8, contained the following:

(c) The parties recognize that each of said parcels of real property is encumbered by loans and requires certain maintenance, upkeep and repair and certain other expenses for the operation thereof. The parties further understand that at the present time neither of said parcels of real property produces sufficient cash flow to meet loan payments and the other expenses above referred to. For this reason, husband agrees that from the date of this agreement forward, so long as they shall own or hold either or both of said parcels of real property, he (as between the parties hereto) shall be responsible for providing from time to time any money required to meet said loan payments or expenses. Husband further agrees to hold wife free and harmless of and from any losses or claims in connection with either or both of said parcels of real property. Upon the sale or disposition of either or both of said parcels of real property, the parties hereto will equally divide the profits or proceeds of such sale or disposition, provided that from such profits or proceeds husband shall be first reimbursed for such moneys as he may have advanced for the parties' joint benefit for either or both of said parcels of real property as hereinabove provided.

(d) In consideration of the foregoing, wife agrees that she will not deduct on her Federal and State income tax returns any depreciation allowable by reason of the ownership of the said 2 parcels of real property. Wife makes no representation or warranty as to the propriety of husband's taking on his income tax returns the depreciation that would be otherwise allowable to her. Husband is informed and advised that this would be proper by reason of the burdens of the ownership assumed by him under this paragraph. Upon the sale or other disposition of either or both of said parcels of real property, each party hereto shall be responsible for reporting on his or her respective income tax returns one-half of the capital gain or loss, if any, realized from such sale or disposition.

By an agreement dated May 12, 1969, the foregoing provisions were modified as follows:

(c) The parties recognize that each of said parcels of real property is encumbered by loans and requires certain maintenance, upkeep and repair and certain other expenses for the operation thereof. The parties further understand that at the present time neither of said parcels of real property produces sufficient cash flow to meet loan payments and the other expenses above referred to. Commenc-

ing with the calendar year 1969, the parties hereto shall contribute equally to their collective share of the money required to meet said loan payments or expenses. Except as otherwise provided herein, the parties shall each report on their federal and state income tax returns one-half of their collective share of the income and one-half of their collective share of the deductions, including (but not limited to) depreciation, arising from or related to said property. Upon the sale or other disposition of either or both of said parcels of real property, each party shall be responsible for reporting on his or her respective income tax returns his or her share of the gain or loss, if any, realized from such sale or disposition, and for purposes of computing the same, all depreciation taken by Husband with respect to said property in the calendar year 1968 shall only reduce the basis of Husband in said property and not the basis of Wife.

In the notice of deficiency, respondent determined that the special allocation of the depreciation deduction provided by the amendment to the partnership agreement "was made with the principal purpose of avoidance of income taxes" and should, therefore, be disregarded. Partnership losses for 1966 and 1967, adjusted to reflect a correction of the amount of depreciation allowable, were allocated equally between the partners.

### ULTIMATE FINDING OF FACT

The principal purpose of the special allocation to petitioners of all of the deductions for depreciation taken by the Orrisch-Crisafi partnership for 1966 and 1967 was the avoidance of income tax.

### OPINION

The only issue presented for decision is whether tax effect can be given the agreement between petitioners and the Crisafis that, beginning with 1966, all the partnership's depreciation deductions were to be allocated to petitioners for their use in computing their individual income tax liabilities. In our view, the answer must be in the negative, and the amounts of each of the partners' deductions for the depreciation of partnership property must be determined in accordance with the ratio used generally in computing their distributive shares of the partnership's profits and losses.

Among the important innovations of the 1954 Code are limited provisions for flexibility in arrangements for the sharing of income, losses, and deductions arising from business activities conducted through partnerships. The authority for special allocations of such items appears in section 704(a),[2] which provides that a partner's share of any item of income, gain, loss, deduction, or credit shall be deter-

---

[2] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(a) EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

mined by the partnership agreement.[3] That rule is coupled with a limitation in section 704(b),[4] however, which states that a special allocation of an item will be disregarded if its "principal purpose" is the avoidance or evasion of Federal income tax. See *Smith* v. *Commissioner*, 331 F. 2d 298 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; *Jean V. Kresser*, 54 T.C. 1621 (1970). In case a special allocation is disregarded, the partner's share of the item is to be determined in accordance with the ratio by which the partners divide the general profits or losses of the partnership. Sec. 1.704–1(b)(2), Income Tax Regs.

The report of the Senate Committee on Finance accompanying the bill finally enacted as the 1954 Code (S. Rept. No. 1622, to accompany H.R. 8300 (Pub.L. No. 591), 83d Cong., 2d Sess., p. 379 (1954)) explained the tax-avoidance restriction prescribed by section 704(b) as follows:

Subsection (b) * * * provides that if the principal purpose of any provision in the partnership agreement dealing with a partner's distributive share of a particular item is to avoid or evade the Federal income tax, the partner's distributive share of that item shall be redetermined in accordance with his distributive share of partnership income or loss described in section 702(a)(9) [i.e., the ratio used by the partners for dividing general profits or losses]. * * *

Where, however, a provision in a partnership agreement for a special allocation of certain items has substantial economic effect and is not merely a device for reducing the taxes of certain partners without actually affecting their shares of partnership income, then such a provision will be recognized for tax purposes. * * *

This reference to "substantial economic effect" did not appear in the House Ways and Means Committee report (H. Rept. No. 1337, to accompany H.R. 8300 (Pub.L. No. 591), 83d Cong., 2d Sess., p. A223 (1954)) discussing section 704(b), and was apparently added in the Senate Finance Committee to allay fears that special allocations of income or deductions would be denied effect in every case where the allocation resulted in a reduction in the income tax liabilities of one

---

[3] Sec. 761(c) defines the term "partnership agreement" as follows:

(c) PARTNERSHIP AGREEMENT.—For purposes of this subchapter, a partnership agreement includes any modifications of the partnership agreement made prior to, or at, the time prescribed by law for the filing of the partnership return for the taxable year (not including extensions) which are agreed to by all the partners, or which are adopted in such other manner as may be provided by the partnership agreement.

[4] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

or more of the partners. The statement is an affirmation that special allocations are ordinarily to be recognized if they have business validity apart from their tax consequences. Driscoll, "Tax Problems of Partnerships—Special Allocation of Specific Items," 1958 So. Cal. Tax Inst. 421, 426.

In resolving the question whether the principal purpose of a provision in a partnership agreement is the avoidance or evasion of Federal income tax, all the facts and circumstances in relation to the provision must be taken into account. Section 1.704–1(b)(2), Income Tax Regs., lists the following as relevant circumstances to be considered:

Whether the partnership or a partner individually has a business purpose for the allocation; whether the allocation has "substantial economic effect", that is, whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences; whether related items of income, gain, loss, deduction, or credit from the same source are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation. * * *

Applying these standards, we do not think the special allocation of depreciation in the present case can be given effect.

The evidence is persuasive that the special allocation of depreciation was adopted for a tax-avoidance rather than a business purpose. Depreciation was the only item which was adjusted by the parties; both the income from the buildings and the expenses incurred in their operation, maintenance, and repair were allocated to the partners equally. Since the deduction for depreciation does not vary from year to year with the fortunes of the business, the parties obviously knew what the tax effect of the special allocation would be at the time they adopted it. Furthermore, as shown by our Findings, petitioners had large amounts of income which would be offset by the additional deduction for depreciation; the Crisafis, in contrast, had no taxable income from which to subtract the partnership depreciation deductions, and, due to depreciation deductions which they were obtaining with respect to other housing projects, could expect to have no taxable income in the near future. On the other hand, the insulation of the Crisafis from at least part of a potential capital gains tax was an obvious tax advantage. The inference is unmistakably clear that the agreement did not reflect normal business considerations but was designed primarily to minimize the overall tax liabilities of the partners.

Petitioners urge that the special allocation of the depreciation deduction was adopted in order to equalize the capital accounts of the

partners, correcting a disparity ($14,000) in the amounts initially contributed to the partnership by them ($26,500) and the Crisafis ($12,500). But the evidence does not support this contention. Under the special allocation agreement, petitioners were to be entitled, in computing their individual income tax liabilities, to deduct the full amount of the depreciation realized on the partnership property. For 1966, as an example, petitioners were allocated a sum ($18,904) equal to the depreciation on the partnership property ($18,412) plus one-half of the net loss computed without regard to depreciation ($492). The other one-half of the net loss was, of course, allocated to the Crisafis. Petitioners' allocation ($18,904) was then applied to reduce their capital account. The depreciation specially allocated to petitioners ($18,412) in 1966 alone exceeded the amount of the disparity in the contributions. Indeed, at the end of 1967, petitioners' capital account showed a deficit of $25,187.11 compared with a positive balance of $405.65 in the Crisafis' account. By the time the partnership's properties are fully depreciated, the amount of the reduction in petitioners' capital account will approximate the remaining basis for the buildings as of the end of 1967. The Crisafis' capital account will be adjusted only for contributions, withdrawals, gain or loss, without regard to depreciation, and similar adjustments for these factors will also be made in petitioners' capital account. Thus, rather than correcting an imbalance in the capital accounts of the partners, the special allocation of depreciation will create a vastly greater imbalance than existed at the end of 1966. In the light of these facts, we find it incredible that equalization of the capital accounts was the objective of the special allocation.[5]

Petitioners rely primarily on the argument that the allocation has "substantial economic effect" in that it is reflected in the capital accounts of the partners. Referring to the material quoted above from the report of the Senate Committee on Finance, they contend that this alone is sufficient to show that the special allocation served a business rather than a tax-avoidance purpose.

According to the regulations, an allocation has economic effect if it "may actually affect the dollar amount of the partners' shares of the

[5] We recognize that petitioners had more money invested in the partnership than the Crisafis and that it is reasonable for the partners to endeavor to equalize their investments, since each one was to share equally in the profits and losses of the enterprise. However, we do not think that sec. 704(a) permits the partners' prospective tax benefits to be used as the medium for equalizing their investments, and it is apparent that the economic burden of the depreciation (which is reflected by the allowance for depreciation) was not intended to be the medium used.

This case is to be distinguished from situations where one partner contributed property and the other cash; in such cases sec. 704(c) may allow a special allocation of income and expenses in order to reflect the tax consequences inherent in the original contributions.

total partnership income or loss independently of tax consequences." [6] The agreement in this case provided not only for the allocation of depreciation to petitioners but also for gain on the sale of the partnership property to be "charged back" to them. The charge back would cause the gain, for tax purposes, to be allocated on the books entirely to petitioners to the extent of the special allocation of depreciation, and their capital account would be correspondingly increased. The remainder of the gain, if any, would be shared equally by the partners. If the gain on the sale were to equal or exceed the depreciation specially allocated to petitioners, the increase in their capital account caused by the charge back would exactly equal the depreciation deductions previously allowed to them and the proceeds of the sale of the property would be divided equally. In such circumstances, the only effect of the allocation would be a trade of tax consequences, i.e., the Crisafis would relinquish a current depreciation deduction in exchange for exoneration from all or part of the capital gains tax when the property is sold, and petitioners would enjoy a larger current depreciation deduction but would assume a larger ultimate capital gains tax liability. Quite clearly, if the property is sold at a gain, the special allocation will affect only the tax liabilities of the partners and will have no other economic effect.

To find any economic effect of the special allocation agreement aside from its tax consequences, we must, therefore, look to see who is to bear the economic burden of the depreciation if the buildings should be sold for a sum less than their original cost. There is not one syllable of evidence bearing directly on this crucial point. We have noted, however, that when the buildings are fully depreciated, petitioners' capital account will have a deficit, or there will be a disparity in the capital accounts, approximately equal to the undepreciated basis of the buildings as of the beginning of 1966.[7] Under normal accounting procedures, if the building were sold at a gain less than the amount of such disparity petitioners would either be required to contribute to the partnership a sum equal to the remaining deficit in their capital account after the gain on the sale had been added back or would

---

[6] This language of sec. 1.704–1(b)(2), Income Tax Regs., listing "substantial economic effect" as one of the factors to be considered in determining the principal purpose of a special allocation, is somewhat similar to the material quoted in the text from S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 379 (1954). But the latter is broader. It is an explanation of the "principal purpose" test of sec. 704(b), and contemplates that a special allocation will be given effect only if it has business validity apart from its tax consequences. Driscoll, "Tax Problems of Partnerships— Special Allocation of Specific Items," 1958 So. Cal. U. Tax Inst. 421, 429 fn. 17; Willis, Handbook of Partnership Taxation 141 (1957).

[7] This assumes, of course, that all partnership withdrawals and capital contributions will be equal.

be entitled to receive a proportionately smaller share of the partnership assets on liquidation. Based on the record as a whole, we do not think the partners ever agreed to such an arrangement. On dissolution, we think the partners contemplated an equal division of the partnership assets which would be adjusted only for disparities in cash contributions or withdrawals.[8] Certainly there is no evidence to show otherwise. That being true, the special allocation does not "actually affect the dollar amount of the partners' share of the total partnership income or loss independently of tax consequences" within the meaning of the regulation referred to above.

Our interpretation of the partnership agreement is supported by an analysis of a somewhat similar agreement, quoted in material part in our Findings, which petitioners made as part of a marital property settlement agreement in 1968. Under this agreement, Orrisch was entitled to deduct all the depreciation for 1968 in computing his income tax liability, and his wife was to deduct none; but on the sale of the property they were to first reimburse Orrisch for "such moneys as he may have advanced," and then divide the balance of the "profits or proceeds" of the sale equally, each party to report one-half of the capital gain or loss on his income tax return. In the 1969 amendment to this agreement the unequal allocation of the depreciation deduction was discontinued, and a provision similar to the partnership "charge back" was added, i.e., while the proceeds of the sale were to be divided equally, only Orrisch's basis was to be reduced by the depreciation allowed for 1968 so that he would pay taxes on a larger portion of the gain realized on the sale. Significantly, in both this agreement and the partnership agreement, as we interpret it, each party's share of the sales proceeds was determined independently from his share of the depreciation deduction.

In the light of all the evidence we have found as an ultimate fact that the "principal purpose" of the special allocation agreement was tax avoidance within the meaning of section 704(b). Accordingly, the deduction for depreciation for 1966 and 1967 must be allocated between the parties in the same manner as other deductions.

*Decision will be entered for the respondent.*

---

[8] We note that, in the course of Orrisch's testimony, petitioners' counsel made a distinction between entries in the taxpayers' capital accounts which reflect actual cash transactions and those relating to the special allocation which are "paper entries relating to depreciation."