Leon A. Harris, Jr., and Marina Harris, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket No. 1589–72.    Filed March 18, 1974.

*William E. Collins* and *Rust E. Reid*, for the petitioners.
*W. John Howard, Jr.*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies of $23,-464.99 and $111,759.41, respectively, in petitioners' 1967 and 1968 Federal income taxes. The issues for decision are:

(1) Whether a partnership, of which petitioner was a member, made an arm's-length sale in 1967 when it conveyed an undivided 10-percent interest in its shopping center real estate to certain trusts; if so,

(2) Whether the loss realized on the 1967 transaction arose, in substance, from the sale of a partnership interest within the meaning of section 741;[1]

(3) Whether petitioner made an arm's-length sale in 1968 when he conveyed an undivided 30-percent interest in the shopping center real estate to certain trusts; if so,

(4) Whether the loss realized on the 1968 transaction arose, in substance, from the sale of a partnership interest within the meaning of section 741; and

(5) Whether the principal purpose of an amendment to the articles of partnership allocating to petitioner the loss on the 1967 transaction was "the avoidance or evasion" of tax within the meaning of section 704(b)(2).

### FINDINGS OF FACT

#### General

Leon A. Harris, Jr. (herein referred to as petitioner), and Marina Harris filed joint Federal income tax returns for 1967 and 1968 with the district director of internal revenue, Dallas, Tex. At the time their petition was filed with this Court, petitioner's legal residence was in Dallas, Tex., and Marina Harris' legal residence was in Bloomington, Ind.

In the early 1950's, Artlah Realty Corp. (hereinafter the corporation) purchased a piece of land in Dallas, Tex., and constructed a shop-

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

ping center on it. Permanent financing for the acquisition and construction of the shopping center was partially provided by a loan of $4 million from the Connecticut General Life Insurance Co. (hereinafter Connecticut).

The debt to Connecticut was evidenced by two notes, dated December 15, 1955, in the amounts of $3,850,000 and $150,000, and was secured by a deed of trust of the same date. The $3,850,000 and $150,000 notes had maturity dates of March 15, 1976, and March 15, 1966, respectively. Commencing on April 15, 1956, the monthly installment payment on the larger note was $24,370.50.

The corporation's operation of the shopping center was not as successful as had been anticipated. In order to save franchise taxes of about $14,000 per year and to obtain the tax benefit of the losses being realized from the shopping center operations, the shareholders decided in the early 1960's to liquidate the corporation and operate the shopping center through a limited partnership.

In April 1962, the corporation was liquidated and the shopping center was distributed to the corporation's shareholders in proportion to their stock ownership. At that time the corporation's stock was owned as follows:

| Shareholders | Percentage |
| --- | --- |
| Charro Corp | 40 |
| Leon A. Harris, Jr | 40 |
| Arthur L. Harris | 10 |
| Leila Harris Ogden | 10 |
| Total | 100 |

The corporation's shareholders formed a limited partnership in 1962 known as Artlah Realty, Ltd. (hereinafter Artlah or the partnership), and contributed to the partnership $40,000 in cash and their respective interests in the shopping center, subject to the debt owed Connecticut. Artlah was organized under the Texas Limited Partnership Act. The partnership's principal asset was the shopping center, and the operation of the shopping center was its sole business. From Artlah's formation until December 28, 1967, the interests of the partners were as follows:

| General partners | Percentage |
| --- | --- |
| Charro Corp | 1 |
| Leon A. Harris, Jr | 1 |
| Limited partners | |
| Charro Corp | 39 |
| Leon A. Harris, Jr | 39 |
| Leila Harris Ogden | 10 |
| Arthur L. Harris | 10 |
| Total | 100 |

The partners agreed to share the income and to charge the losses to the capital accounts in accordance with their corresponding percentages of ownership. The partnership kept its books and filed its Federal income tax information returns using the calendar year.

Charro Corp. (hereinafter Charro) is a Texas corporation. From its inception in 1962 through 1968, all of Charro's stock was owned by Arthur Kramer, Jr. (hereinafter Kramer), and trusts for his children. Kramer was the president and chief executive officer of Charro throughout this period. Kramer, Arthur L. Harris, and Leila Harris Ogden are first cousins of petitioner.

Under the terms of the "Articles of Partnership" of Artlah, the general partners could not voluntarily retire from the partnership without being liable to the limited partners and the limited partners could not assign any part of their interests in the partnership without the written consent of the other partners. The only exception to these restrictions related to transfers to their controlled corporations and, in the case of the limited partners, transfers to nonprofit charitable, religious, or educational organizations.

The shopping center's main tenant was Federated Department Stores, Inc. (Federated). Its lease, which expires in 1975, calls for the payment of a specified minimum rent, not disclosed by the record, plus a percentage of the sales by the department store operated on the premises. The lease contains no requirement that Federated occupy the leased space during the term of the lease.

Sometime after forming Artlah, petitioner became aware that the partnership's depreciation and interest deductions were gradually growing smaller. He was informed by his attorney that in the near future these deductions would not be sufficient to shield him from income taxes on the rental income used to make the monthly amortization payments to Connecticut. Accordingly, petitioner decided he should dispose of his interest in the shopping center.

Because of the limitations in the partnership agreement governing transfers of interests in the partnership, on several occasions petitioner discussed with Kramer his desire to dispose of his interest in the center. Kramer did not share petitioner's pessimistic views about the business. However, Kramer agreed to consider selling the entire shopping center if a satisfactory offer were made for the property. Petitioner then made several attempts to solicit offers for the property but could not obtain an offer acceptable to the other partners.

### The 1967 Transfer to the Trusts

In late 1967, following petitioner's unsuccessful efforts to find a buyer of the shopping center, petitioner's attorney, William C. Garrett

(hereinafter Garrett), advised petitioner that Kramer and Sol Goodell (hereinafter Goodell), Kramer's attorney, might be interested in acquiring his interest in the shopping center property. Garrett also advised petitioner that if they were interested in acquiring his interest, it would be preferable, for tax purposes, to have the arrangement cast as a sale of an interest in the shopping center real estate rather than as a sale of an interest in the partnership. After some negotiations Kramer and Goodell offered to purchase a 10-percent interest in the shopping center real estate, subject to the existing indebtedness to Connecticut, for $6,250.

Pursuant to this proposal, on December 28, 1967, Artlah conveyed an undivided 10-percent interest in the shopping center real estate (but not the personal property) to Kramer, his wife, Mildred, and Goodell, trustees of a trust established for the Kramer children, and to Goodell and William Collins (hereinafter Collins), trustees of trusts established for the Goodell children. The 10-percent interest, which was subject to the existing debt to Connecticut, was conveyed 6 percent to the trust for the Kramer children and 4 percent to the trusts for the Goodell children.

The purchasers simultaneously leased their interests in the shopping center real estate back to Artlah. The monthly rental payment under the lease equaled 10 percent of the monthly mortgage payment due Connecticut, and the term of the lease coincides with the remaining period of the mortgage. The lease calls for a downward adjustment of the rental payment if the previous year's "gross annual revenues" from the shopping center are "less than the annual operating costs and expenses of the shopping center" for that year. The monthly rental payment may be increased if gross annual revenues exceed such costs and expenses. However, the annual rental payments may not increase beyond an amount equal to 10 percent of the mortgage payments, except to restore amounts by which the rents have been previously reduced on account of deficiencies in gross revenues. The parties to the transaction further agreed that if either set of trusts fails to pay its share of the indebtedness to Connecticut, then upon demand the defaulting trust(s) will reconvey to the partnership its interest in the shopping center real estate.

Neither Kramer, his wife, and Goodell, as trustees of the trust established for the Kramer children, nor Goodell and Collins, as trustees of the trusts for the Goodell children, ever became partners in Artlah.

Artlah treated the December 28, 1967, transaction as giving rise to a

loss of $62,321.56 occasioned by the sale of a section 1231 asset. Artlah computed the loss, which was reported on its 1967 return, as follows:

| Detail—description | 4% interest | 6% interest | Total 10% interest |
|---|---|---|---|
| Cash received | $2,400.00 | $3,600.00 | $6,000.00 |
| Other | 100.00 | 150.00 | 250.00 |
| Mortgage portion | 83,020.49 | 124,530.73 | 207,551.22 |
| Total consideration | 85,520.49 | 128,280.73 | 213,801.22 |
| Less—land cost | (8,330.14) | (12,495.22) | (20,825.36) |
| Depreciable asset cost | (145,439.52) | (218,159.27) | (363,598.79) |
| Depreciation reserve | 43,320.55 | 64,980.82 | 108,301.37 |
| Sec. 1231 loss | (24,928.62) | (37,392.94) | (62,321.56) |

Included on its 1967 return was a balance sheet that showed Artlah had, as of the end of the taxable year, cash of $15,204.23, accounts receivable—less allowance for bad debts—of $8,538.60, and other assets—other than land, buildings, and other fixed depreciable assets—listed at $28,349.31.

Prior to Artlah's conveyance to the trusts of the interests in the real estate, it had been agreed among the parties that the proceeds from the transaction would be allocated and distributed to petitioner, that the computed loss and the reduction of the partnership interest in the shopping center real estate resulting from such transaction would be allocated solely to him, that his interest in the partnership assets and the capital account would be reduced by an amount equal to such computed loss and reduction, and that there would be a corresponding adjustment of his distributable share of the partnership taxable income. In line with this agreement, the "Articles of Partnership" of Artlah were amended, effective December 28, 1967, and the limited partners' interests in Artlah and their respective shares of its profits or losses were changed to the following:

| Limited partners | Percentage |
|---|---|
| Charro Corp | 43.45 |
| Leon A. Harris, Jr | 32.33 |
| Arthur L. Harris | 11.11 |
| Leila Harris Ogden | 11.11 |
| Total | 98.00 |

The interest of each of the two general partners remained at 1 percent.

On their 1967 joint Federal income tax return, petitioners claimed a deduction in the amount of $62,321.56 against their ordinary income.

### The 1968 Sales to the Trusts

Sometime in 1968 petitioner discussed with Garrett the disposition of the remainder of his interest in Artlah. Garrett informed petitioner

that if Kramer and Goodell agreed to purchase part but not all of petitioner's remaining interest in Artlah, he would pay $1,000 for whatever was left.

On November 1, 1968, petitioner, with the consent of the other partners, withdrew as a general and limited partner in Artlah, and he received in full satisfaction of his partnership interest an undivided 30-percent interest in the shopping center real estate (this 30-percent interest was an undivided 33⅓-percent interest in Artlah's 90-percent interest in the shopping center real estate), subject to the existing debt to Connecticut. On the same date, petitioner and Artlah entered into a lease agreement whereby petitioner leased back to Artlah his undivided 30-percent interest in the property. As in the case of the lease, described above, covering the undivided 10-percent interest, the maximum monthly rental is keyed to the amount of the monthly mortgage payment due Connecticut.

After petitioner's withdrawal from the partnership on November 1, 1968, Artlah was owned as follows:

| General partner | Percentage |
| --- | --- |
| Charro Corp. | 1 |
| *Limited partners* | |
| Charro Corp. | 65⅔ |
| Arthur L. Harris | 16⅔ |
| Leila Harris Ogden | 16⅔ |
| | |
| Total | 100 |

From and after November 1, 1968, petitioner was no longer a partner in Artlah, and he did not thereafter directly or indirectly become a partner in Artlah.

On December 24, 1968, petitioner conveyed his undivided 30-percent interest in the shopping center real estate and lease agreement to the following persons:

| | Proportion |
| --- | --- |
| Arthur L. Kramer, Jr., Mildred L. Kramer, and Sol Goodell, trustees | 6% |
| Sol Goodell and William Collins, trustees | 4% |
| William C. Garrett, trustee | 20% |

Garrett was acting as trustee of a trust established for the benefit of his children. As a trustee he never became a partner in Artlah.

On their 1968 joint Federal income tax return, petitioners reported the December 24, 1968, transaction as a sale of a section 1231 asset giving rise to a loss deduction of $212,825.92, computed as follows:

| Detail | 4%<br>disposition | 6%<br>disposition | 20%<br>disposition | 30% total |
|---|---|---|---|---|
| Cash consideration | $2,400.00 | $3,600.00 | $1,000.00 | $7,000.00 |
| Mortgage portion | 74,892.00 | 112,338.25 | 374,460.95 | [1] 561,691.37 |
| Depreciation reserve | 50,315.76 | 75,473.64 | 251,579.16 | [2] 337,368.56 |
| Basis | (154,697.65) | (231,597.60) | (772,590.60) | (1,158,885.85) |
| Loss | [3] (27,089.72) | (40,185.71) | (145,550.49) | [4] (212,825.92) |

These figures were stipulated to by the parties but, as respectively footnoted above, they reflect the following mathematical errors:

[1] The total mortgage portion of the interests contained in the chart should be $561,691.*20*.
[2] The total depreciation reserve of the interests contained in the chart should be $377,368.56.
[3] $27,089.*89* was the loss on the disposition of the 4% interest.
[4] Considering these adjustments, the total loss on the 30% disposition was $212,82*6.09*.

The balance sheet included as part of Artlah's 1968 return reflected that, as of the end of its taxable year, the partnership had cash of $9,463.91, accounts receivable—less allowance for bad debts—of $19,450.43, and other assets—other than land, buildings, and other fixed depreciable assets—listed at $22,946.46.

### OPINION

As to 1967 respondent determined that the claimed section 1231 loss of $62,321.56 was not allowable on the grounds that (a) the transfers were not a bona fide arm's-length transaction; (b) alternatively, if the transaction produced a tax loss, any loss ultimately held to be allocable to petitioner resulted, "in substance and effect," from a disposition of a partial interest in a partnership and is subject to capital asset treatment under section 741; and (c) tax avoidance was the principal purpose of the allocation of the loss pursuant to the amended partnership agreement of December 28, 1967, and such allocation is not permissible under section 704.

As to 1968 respondent determined that the claimed section 1231 loss of $212,825.92 was not allowable on the grounds that (a) the transfers to the trusts were not a bona fide arm's-length transaction, and (b) if a loss was incurred in the transaction, such loss resulted, "in substance and effect," from the disposition of petitioner's interest in the partnership and is subject to capital asset treatment under section 741.

### Issues 1 and 3. Arm's-Length Character of 1967 and 1968 Transactions

As best as we can discern, respondent advances two arguments to support his thesis that the 1967 and 1968 losses should be disallowed on the ground that they were not the product of arm's-length dealing. First, he argues that the transactions lacked economic substance. Second, he maintains that the transactions were in part sales and in part gifts and, for this reason, no loss was sustained.

The argument that the transactions lacked economic substance is without merit. As a result of these transactions, petitioner relinquished his entire interest in the partnership and its assets. The trusts, although they did not become partners, acquired ownership of undivided interests in the partnership real estate, subject to the 1967 security agreement to reconvey their interests to Artlah in the event of a default on the Connecticut note. Neither petitioner nor his wife nor any of their children had any interest in the acquiring trusts, either as beneficiary or as trustee. As consideration for the transfers, petitioner received from the partnership or from the purchasers cash and other property worth in excess of $13,000, and he was relieved prospectively of his potential liabilities as a general partner. These stipulated facts show there is no basis for holding that the transactions lacked economic substance.

We think the second argument—that the transactions were in part sales and in part gifts, see sec. 1.1001-1(e)(1), Income Tax Regs.[2]— is equally lacking in merit. The record clearly shows that petitioner endeavored to negotiate the best possible deal. The beneficiaries of the trusts were not the natural objects of his bounty, and he had never previously made gifts to any of them. Petitioner was one of the two general partners in the shopping center, which was evidently barely breaking even, and the partners had been required to contribute funds from time to time to keep the business afloat.[3] Petitioner was fearful that, as the deductions for depreciation and interest continued to decrease, he would be required to pay, out of funds derived from nonpartnership sources, taxes on income used solely to pay the installments on the note to Connecticut.

Nevertheless, based on expert testimony that the values of the undivided interests in the shopping center real estate transferred in 1967 and 1968 exceeded the amounts paid by the trusts, respondent insists that a gift can be inferred. Respondent's expert testified that the values of the interests transferred in 1967 and 1968 were $254,024 and $735,698, respectively, whereas the consideration for the 1967 transfer was $213,801.22 (cash, $6,000; mortgage portion, $207,551.22; other, $250), and for the 1968 transfer was $568,691.37

[2] Sec. 1.1001-1 Computation of gain or loss.

(e) *Transfers in part a sale and in part a gift.* (1) Where a transfer of property is in part a sale and in part a gift, the transferor has a gain to the extent that the amount realized by him exceeds his adjusted basis in the property. However, no loss is sustained on such a transfer if the amount realized is less than the adjusted basis. For the determination of basis of property in the hands of the transferee, see § 1.1015-4. For the allocation of the adjusted basis of property in the case of a bargain sale to a charitable organization, see § 1.1011-2.

[3] The partnership agreement indicates that the partners contributed $40,000 in cash in 1962, when the partnership was formed, and the partnership income tax return for 1964 shows the partners contributed $30,000 to the capital of the partnership in that year.

(cash, $7,000; mortgage portion, $561,691.37). Respondent maintains that these disparities [4] show that the losses were not the product of arm's-length dealing. We do not agree.

Respondent's expert based his opinion mainly upon the amount of revenue generated by the shopping center. Yet the witness admitted that he examined none of the tenants' leases to ascertain how long the 1967 and 1968 levels of income could reasonably be projected. As reflected in our Findings, for example, the rent paid by the main tenant, Federated, was based in part on its sales, and any substantial decrease in its sales would cause a corresponding decrease in rent. Nor did respondent's witness take into account the facts that undivided interests were being valued and that petitioner, for the reasons stated above, had wanted to rid himself of the partnership responsibilities.

The testimony of respondent's expert may be sufficient to show that investors might reasonably have differed as to the value of the property. But difference of opinion as to value is frequently the key to understanding why business transactions occur. The differences here involved are not sufficient to show lack of arm's-length dealing. *Morris M. Messing*, 48 T.C. 502, 510 (1967) ; *Carl E. Weller*, 38 T.C. 790, 807 (1962) ; cf. sec. 25.2512–8, Gift Tax Regs. We do not think the record will support a finding that petitioner intended to, or did, make a gift to the trusts of a part of his interest in the partnership. The provisions of section 1.1001–1(e)(1) of the regulations do not apply.

### *Issues 2 and 4. Character of Losses Arising From 1967 and 1968 Transactions*

Had petitioner in 1962 sold at a loss the 40-percent interest in the shopping center real estate which he acquired on the liquidation of the corporation, the amount of any loss recognized on the sale would have been deductible from ordinary income under section 1231. Instead of selling that interest, he contributed it to the newly formed partnership in a nontaxable exchange for an interest in the partnership. Sec. 721. At the conclusion of the 1967 and 1968 transactions, petitioner's interests in both the real estate and the partnership had been terminated. The question is whether, under the steps taken to terminate his investment, petitioner's resulting losses in those years are ordinary or capital.

A separate analysis of the tax consequences of each year's transaction is required, but the ground rules for both examinations may be stated in general terms. The general rule is that an interest in a

---

[4] Petitioner points out that the adjusted bases of the interests transferred in 1967 and 1968 were $276,122.78 and $781,517.29, respectively. Thus, even if the property had been sold at the values asserted by respondent's expert, a loss of $22,098.78 would have been realized in 1967 and a loss of $45,819.29 would have been realized in 1968.

partnership is a capital asset, and a sale of part or all of such an interest, subject to exceptions (unrealized receivables and inventory substantially appreciated in value) not material here, produces capital gain or loss. Sec. 741; [5] sec. 1.741-1, Income Tax Regs.; Rev. Rul. 59-109, 1959-1 C.B. 168. On the other hand, no loss is recognized to a partner on a distribution by a partnership unless the distribution is in liquidation of the partner's interest *and* only money, unrealized receivables, and inventory are distributed to him. Sec. 731(a)(2).[6] His basis in the distributed property (his basis in his partnership interest, subject to adjustments) is determined under section 732, and the character of the gain or loss realized on the subsequent disposition of such property, as a general rule, is not affected by its having been owned by the partnership. Cf. sec. 735.

Of primary significance in determining the character of the losses in the instant case is section 1231[7] which, in described situations, allows ordinary treatment of losses realized from the sale of "section 1231 property." The definition of "section 1231 property" includes "real property used in the trade or business," such as leased real estate. *Gilford* v. *Commissioner*, 201 F.2d 735 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court; *Anders I. Lagreide*, 23 T.C. 508, 512 (1954). In the present case, this means that ordinary losses were realized if, in substance, (1) the partnership in 1967 sold an undivided interest in the shopping center real estate prior to any distribution

---

[5] SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset, except as otherwise provided in section 751 (relating to unrealized receivables and inventory items which have appreciated substantially in value).

[6] Sec. 731(a)(2) provides a means of timing the deductibility of losses on the sale of distributed property where the fair market value of such property is less than its adjusted basis in the hands of the distributee partner. See Willis, Partnership Taxation 337 (1971). However, the tax effect of any transaction in such property is governed by its substance rather than its form. See *Crenshaw* v. *United States*, 450 F.2d 472, 477-478 (C.A. 5, 1971), certiorari denied 408 U.S. 923 (1972).

[7] Sec. 1231, in pertinent part, is as follows:

(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, * * * exceed the recognized losses from such sales, * * * [or] exchanges, * * * such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchange of capital assets. * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For purposes of this section—

(1) GENERAL RULE.—The term "property used in the trade or business" means * * * real property used in the trade or business, held for more than 6 months, which is not—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. * * *

to petitioner, or (2) the partnership in 1968 distributed an undivided interest in the center to petitioner in 1968, and he then sold the real estate to third parties.

(a) *The 1967 transaction.*—Respondent argues that the "true substance of the transaction" in 1967 was "a sale of a partnership interest" and that the resulting loss was a capital loss under section 741. He maintains in his reply brief that:

The trusts acquired more than a portion of the physical asset. They acquired a portion of a going business which they entered as joint * * * [venturers]. Therefore, any loss to petitioners by this disposition of their partnership interest constitutes a capital loss. * * *

The factual premise for this reasoning is apparently contained in a portion of the immediately succeeding paragraph of the reply brief:

Rentals based upon profits may not create a partnership. However, here, the trusts did acquire the interest in the property interest underlying Harris' partnership interest subject to lease back arrangement whereby the rentals increased or decreased as annual income of the partnership increased or decreased.

Apparently, respondent is contending that the trusts acquired the equivalent of a partnership interest in Artlah or in a joint venture with Artlah and that the 1967 transaction should be viewed as though that interest was acquired directly from petitioner. However, the record does not support this argument.

True enough, the 10-percent real estate interest was immediately leased back to the partnership but, contrary to respondent's premise, the rentals did not increase or decrease "as annual income of the partnership increased or decreased." The lease called for a monthly rental of $2,437.05 (10 percent of the monthly payment on the note to Connecticut), subject to a downward adjustment for any deficiency in revenues in relation to costs, according to a prescribed formula, and an upward adjustment in the next year for any excess in revenues over costs, according to the same formula. However, the upward adjustment in the rental is to continue only "until any amounts by which the rents have been previously reduced are restored and paid to Lessor." Thus, the fundamental factual premise of respondent's argument is erroneous.

Moreover, as reflected in our Findings, Artlah conveyed a 10-percent interest in the shopping center real estate to the trusts, subject to the Connecticut lien and the outstanding lease. The transfer did not cover any other property owned by the partnership, which, according to the 1967 partnership return, included cash, accounts receivable, and other assets. On its books and on its information income tax return, Artlah treated the transaction as a sale of an interest in real estate and adjusted the partnership's basis in its remaining real estate and in the capital accounts accordingly. The partnership agreement was amended to reflect Artlah's ownership of a 90-percent in-

terest in the real estate rather than ownership of the whole. Also, it is stipulated that as a result of the conveyance, the trusts together owned 10-percent and Artlah owned 90-percent interests in the real estate and, further, that neither set of the trustees ever became partners in Artlah. Cf. *Crenshaw* v. *United States*, 450 F.2d 472, 476 (C.A. 5, 1971), certiorari denied 408 U.S. 923 (1972).

We think it apparent from these facts that the trusts acquired only an undivided 10-percent interest in the real estate, not an interest in Artlah or an interest in a joint venture with Artlah. As a result of the conveyance to them, the trusts did not acquire the right to share in the profits derived from the operation of the shopping center or the proceeds of the liquidation of its assets. *Donald L. Evans*, 54 T.C. 40, 50 (1970), affd. 447 F.2d 547 (C.A. 7, 1971); cf. *Jones* v. *Phinney*, an unreported case (W.D. Tex. 1958, 1 A.F.T.R.2d par. 58–669, 58–1 U.S.T.C. par. 9484). There was no intention that the trusts, though co-owners of the real property, would become partners or joint venturers. Cf. *Mihran Demirjian*, 54 T.C. 1691, 1696–1698 (1970), affd. 457 F.2d 1 (C.A. 3, 1972). The trusts acquired only the rights of an owner and lessor of an undivided 10-percent interest in the shopping center real estate, and the mere holding of property as tenants in common with another performing management services does not make one a partner or joint venturer. *Gilford* v. *Commissioner*, 201 F.2d at 736.

The tax consequences of the allocation to petitioner of the entire loss on the sale are discussed below. However, that allocation did not affect the character of the transaction between Artlah and the trusts. The allocation agreement was reached by petitioner and the other partners without the participation of the trusts. After the sale was completed, petitioner and the other partners executed a revised partnership agreement which recognized that Artlah thereafter owned only a 90-percent interest in the shopping center real estate and adjusted the respective shares of the several partners in the profits or losses and the proceeds of dissolution accordingly.

On the basis of the record before us, we hold that the 1967 transaction was a sale by Artlah to the trusts of an undivided 10-percent interest in the shopping center real estate and that the resulting loss was derived from the sale of section 1231 property.

(b) *The 1968 transaction.*—Again, as in the case of the 1967 transaction, respondent argues that the true substance of the 1968 transaction, when viewed as a whole rather than in fragmented parts, was a sale of a partnership interest within the meaning of section 741, citing *Kinney* v. *United States*, 358 F.2d 738 (C.A. 5, 1966). Respondent also repeats his argument that the trusts, in substance, became joint venturers with Artlah in the operation of the shopping center.

Respondent is correct, as a general rule, in arguing that the substance rather than the form of a taxpayer's dealings governs their

tax effect. Otherwise, the true nature of a transaction could be disguised by mere formalisms designed only to alter tax liabilities. *Crenshaw* v. *United States*, 450 F.2d at 475–476. But a mere incantation of "substance versus form" and "step transaction" does not transform a transaction with·one set of tax consequences into a transaction with different tax consequences. These doctrines require a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened. And respondent never tells us how he would recast the transaction here in dispute, that is, what steps he would have us ignore, combine, or rearrange to produce the result which he advocates.

The stipulated facts are that on November 1, 1968, petitioner "withdrew as a general and limited partner in Artlah" and received an undivided 30-percent interest in the shopping center real estate "in full satisfaction of his partnership interest." As if to make the point doubly clear, the stipulation states, further, that from and after November 1, 1968, petitioner "was no longer a partner in Artlah" and that "He did not thereafter, directly or indirectly, become a partner in Artlah." Not until December 24, 1968, did he convey to the trusts his undivided 30-percent interest in the real estate. It is difficult to see how he could have sold his partnership interest to the trusts, which acquired nothing until December 24, 1968, since he was not a partner and had owned only an interest in the shopping center real estate after November 1, 1968.

But even if we are to give a strained interpretation to the stipulation of facts to preserve respondent's substance-versus-form and step-transaction argument, his case must fail. Here, again, it is an agreed fact that the purchasing trustees did not become partners in Artlah and, for this reason, the transaction was not one in which petitioner sold his partnership interest.

It is true that the Court of Appeals in *Crenshaw* v. *United States*, *supra*, as emphasized by respondent, applied the substance-versus-form and step-transaction doctrines and concluded that the transaction there involved was a sale of a partnership interest. However, the reasoning of the court is fatal to respondent's cause. In that case, the taxpayer desired to sell her interest in a partnership. A transaction was arranged whereby she received from the partnership a distribution of an undivided 50/225 interest in Pine Forest Apartments, which she transferred to the estate of her deceased husband in exchange for a shopping center. The estate then sold its interest in Pine Forest Apartments to a third party for cash. In what the court referred to as step (iv), the third party transferred its interest in Pine Forest Apartments to the partnership in exchange for the partnership interest which had been owned by the taxpayer. Holding that the substance of the transaction was a sale of the taxpayer's interest in the partnership, the court said (450 F.2d at 476) :

Obviously what happened here was not equivalent to a sale unless the final step (iv) was consummated—that is, unless Mrs. Wilson's undivided 50/225 interest in the Pine Forest Apartments ultimately found its way back into the partnership now owned by the two Blairs. If it had not, Taxpayer's partnership interest would have been "liquidated," in every conceivable sense of that term, and the complete obliteration of it simply could not have been characterized as a "sale" if none of it had survived to be "sold."

However, the partnership interest *did* survive because, as the parties have stipulated * * *, it was transferred to the Blair Investment Company in return for its undivided interest in the Pine Forest Apartments. In return for its $200,000 cash payment the corporation (Blair Investment) received exactly the partnership interest it would have obtained by way of a direct purchase from Taxpayer. A sale, not a "liquidation," occurred because what had formerly been Taxpayer's partnership interest was acquired by the Blairs' corporate alter ego and the relative economic positions of the parties were the same as they ultimately would have been had a direct sale taken place.

In the instant case, petitioner's partnership interest did not survive after November 1, 1968. It was obliterated. As noted, the purchasing trustees did not become partners in Artlah. After December 24, 1968, the trusts together owned an undivided 40-percent (i.e., the 10 percent acquired in 1967 and the 30 percent in 1968) interest in the shopping center real estate, and Artlah owned the remaining 60 percent. The trusts did not acquire either an interest in the profits of the operations of the partnership or a right to share in the proceeds that would result from its liquidation. See *Donald L. Evans*, 54 T.C. at 50. The sale in 1968 of petitioner's undivided 30-percent interest in the shopping center real estate was a sale of section 1231 property, and petitioner, as owner of that property, realized an ordinary loss.

## Issue 5. Allocation of the 1967 Loss

Having determined that Artlah sold the 10-percent interest in the shopping center real estate to the trusts in 1967 at a loss, we must also decide how much of that loss petitioner is entitled to deduct. The question is whether the amendment to the partnership agreement allocating the entire amount, rather than only 40 percent, of the loss to petitioner must be given effect under section 704(a) and (b).[8] We think it must.

---

[8] SEC. 704. PARTNER'S DISTRIBUTIVE SHARE.

(a) EFFECT OF PARTNERSHIP AGREEMENT.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

(b) DISTRIBUTIVE SHARE DETERMINED BY INCOME OR LOSS RATIO.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle.

In determining his income tax, each partner is required by section 702(a)(3)[9] to take into account separately his distributive share of the partnership losses from the sale of section 1231 property. Section 704(a), however, permits the partners to agree how the partnership's section 1231 losses will be shared, subject to the qualification in section 704(b) that the provision in the agreement on the sharing of such losses will be disregarded if its "principal purpose" is the "avoidance or evasion of any tax." See *Smith* v. *Commissioner*, 331 F. 2d 298 (C.A. 7, 1964), affirming a Memorandum Opinion of this Court; *Stanley C. Orrisch*, 55 T.C. 395 (1970), affirmed per curiam (C.A. 9, 1973); *Jean V. Kresser*, 54 T.C. 1621 (1970); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 379 (1954).

As a guide for determining whether tax avoidance or evasion is the principal purpose of a special allocation provision, section 1.704–1 (b)(2), Income Tax Regs., lists the following relevant circumstances to be considered:

Whether the partnership or a partner individually has a business purpose for the allocation; whether the allocation has "substantial economic effect", that is, whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences; whether related items of income, gain, loss, deduction, or credit from the same source are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation. * * *

An examination of our Findings in the light of these criteria shows the principal purpose of the allocation to petitioner of the loss on the 1967 sale was not tax avoidance.

We cannot ignore the fact that the 1967 disposition was part and parcel of the actual implementation of an overall plan for the liquidation of petitioner's investment in the shopping center real estate. That business plan was the product of arm's-length bargaining with petitioner's partners, who did not share petitioner's desire to liquidate the shopping center investment and who, along with petitioner, wanted the agreement so structured that their respective tax burdens

---

[9] SEC. 702. INCOME AND CREDITS OF PARTNER.

(a) GENERAL RULE.—In determining his income tax, each partner shall take into account separately his distributive share of the partnership's—

\* \* \* \* \* \* \*

(3) gains and losses from sales or exchanges of property described in section 1231 (relating to certain property used in a trade or business and involuntary conversions),

would be clearly delineated [10]—a procedure that Congress plainly intended to sanction when it enacted the 1954 Code. See *David A. Foxman*, 41 T.C. 535, 550–551 (1964), affd. 352 F.2d 466 (C.A. 3, 1965) ; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 379 (1954).

Furthermore, of critical significance is the obvious "economic effect" of the allocation agreement. Petitioner received the cash proceeds of the sale; the loss allocated to him was applied to reduce his capital account, and his share of the related items of future profits, losses, and proceeds in case of liquidation was reduced proportionately. Such an economic impact sharply distinguishes the instant situation from that which obtained in *Stanley C. Orrisch*, 55 T.C. at 403–404, where, as far as the Court could determine, the depreciation allocation produced only a transitory "economic effect."

Moreover, the loss allocated to petitioner does not exceed the deduction he would have received if the partnership had sold this one asset, i.e., the shopping center, sec. 702(a) (3), or distributed it to the partners and they had sold it, sec. 1231. No doubt the desire of petitioner to obtain an ordinary instead of a capital loss was a motivating factor in the structuring of all the transactions herein, including the 1967 disposition, but, given the circumstances previously outlined, and especially the exact equivalence between the amount of the loss and the economic effect as among the partners, we think petitioner has carried his burden that the "principal purpose" of the amendment to the partnership agreement was not the avoidance or evasion of tax within the meaning of section 704(b) (2).[11]

To give effect to the foregoing conclusions and to other adjustments,

*Decision will be entered under Rule 155.*

---

[10] The agreement by the parties was summarized in the stipulation as follows :

"Prior to the conveyance of said undivided 10% interest in the Shopping Center real estate by Artlah it had been agreed among Leon A. Harris, Jr., the other partners and Artlah that the proceeds from such transaction would be allocated and distributed to Leon A. Harris, Jr., that the computed loss and the reduction of the partnership interest in the Shopping Center real estate resulting from such transaction would be allocated solely to him, that his interest in the partnership assets and the capital account would be reduced by an amount equal to such computed loss and reduction and that there would be a corresponding adjustment of his distributable share of the partnership taxable income."

[11] See *Stanley C. Orrisch*, 55 T.C. 395, 400–401 (1970), affirmed per curiam (C.A. 9, 1973) ; Willis, Partnership Taxation 204 (1971) ; Aronsohn, "Tax Planning for Acquisition and Operation of Investment Real Estate by Groups of Investors," 18 Tul. Tax Inst. 573, 607–611 (1969) ; Driscoll, "Tax Problems of Partnerships—Special Allocation of Specific Items," 1958 So. Cal. Tax Inst. 421, 426.