**James E. and Frances J. ALLISON,**
**Appellees,**

v.

**The UNITED STATES, Appellant.**

**Appeal No. 158–78.**

United States Court of Appeals, Federal Circuit.

March 7, 1983.

Jay G. Philpott, Jr., Washington, D.C., argued for appellant. With him on the briefs were Glenn L. Archer, Jr., Asst. Atty. Gen., and Theodore D. Peyser, Jr., Washington, D.C.

Robert I. White, Houston, Tex., argued for appellees. On the brief were Larry A. Campagna, George A. Hrdlicka and Chamberlain, Hrdlicka, White, Johnson & Williams, Houston, Tex.

Before DAVIS, BENNETT and NIES, Circuit Judges.

DAVIS, Circuit Judge.

The Government appeals the judgment of the United States Claims Court,* which granted plaintiffs recovery of amounts which they had been required to pay by the Internal Revenue Service (IRS) as additional federal income taxes and deficiency interest for 1970. We reverse.

Taxpayer-plaintiff James E. Allison of Houston, Texas, invested in 1970 $10,459 in the R. Ashland Shepherd partnership (Shepherd). Shepherd during 1970 invested in a second partnership, Indonesian Marine Resources (Indomar), which in turn invested in a third partnership, Southeast Exploration (Souex). Souex was engaged in an offshore oil and gas drilling venture near Indonesia. The question is whether the principal purpose of a special allocation in the Souex partnership agreement (Agreement) of intangible drilling costs (IDC) deductions to Indomar was the "avoidance or evasion of taxes", as proscribed by section 704(b)(2) of the Internal Revenue Code of 1954.[1] Allison's involvement stems from his liability for the amount of taxes corresponding to his share of Souex's IDC for 1970, the payment of which had been required by the IRS after examination of his 1970 federal income tax return.[2]

## I

The chain of events leading to this case began on September 6, 1968 when Independent Indonesian American Petroleum Company (IIAPCO) entered into an oil production sharing contract with Pertamina, the Indonesian state oil and gas enterprise. The contract required IIAPCO to undertake a drilling program in an unexplored offshore area of approximately 32 million acres off the southeast coast of Sumatra.[3] Shortly thereafter, IIAPCO assigned interests in this venture to Carver-Dodge International (Carver-Dodge) and Warrior International (Warrior).

The management of Reading and Bates Offshore Drilling Company (Reading & Bates), an oil drilling company that had previously worked with IIAPCO in similar enterprises, learned that IIAPCO was seeking risk capital to finance exploratory drilling under the contract with Pertamina. Herbert Dillon, an independent oil operator in Houston, became interested in providing that capital in the spring of 1969, after having spoken with a member of Reading & Bates' management. Dillon authorized Reading & Bates to act as his undisclosed agent in negotiations with IIAPCO, Carver-Dodge and Warrior. These negotiations resulted in a letter agreement on August 22, 1969, approved in advance by Dillon, which provided that these parties would form a partnership [later to be called Souex] to explore for and (if possible) produce oil, with the original three members contributing the lease, Reading & Bates providing drilling of 40,000 feet of hole in the contract area and receiving a 17 percent interest, and tax deductions for IDC to be allocated to the party supplying the cash for the drilling costs. Dillon was introduced by Reading & Bates to the others as the investor-partner on August 25, 1969.

Dillon formed Indomar, a Texas limited partnership, in order to raise the capital necessary to cover the exploratory drilling costs of Reading & Bates. He sought "peo-

* Pursuant to the order of this court dated October 4, 1982, Chief Judge Kozinski entered judgment on October 8, 1982, corresponding to the decision recommended by Senior Trial Judge White in this case.

1. The deductibility of the expenses as IDC, under I.R.C. § 263(c), is not in issue.

2. Mr. Allison's wife Frances is a party only because she signed a joint income tax return in 1970 with her husband. References in this opinion to "plaintiff" and to "Allison" are to Mr. Allison.

3. IIAPCO paid Pertamina $1,000,000 and obligated itself to spend at least $22,500,000 over the next ten years in exploring for and, if possible, producing oil and gas in the contract area. If oil was discovered in commercial quantities, IIAPCO was to recover all of its expenditures out of 40 percent of the proceeds, and the remainder of the proceeds were to be divided 65 percent to Pertamina and 35 percent to IIAPCO. The contract also provided for a sharing of proceeds if gas was discovered which could be commercially sold.

ple whose tax positions let them afford to invest." (Dillon testimony, R. 133). Dillon's attorney, Ashland R. Shepherd, formed the R. Ashland Shepherd partnership to invest in Indomar. Taxpayer Allison invested in Shepherd.

In December 1969, the Souex partnership Agreement was executed by IIAPCO, Carver-Dodge, Warrior, and Indomar, to supplant the August 22, 1969 letter agreement. Under this Agreement, Souex owned 96 percent of the working interest in the contract area, and Reading & Bates retained a 4 percent interest outside of the partnership under a collateral pact.

The Agreement was retroactively binding to August 22, 1969, and dealt with several relevant points:

(1) Partnership Interests:

| Partner | Percentage |
| --- | --- |
| IIAPCO | 59.0000 |
| Carver-Dodge | 19.6131 |
| Warrior | 7.8452 |
| Indomar | 13.5417 |

(2) *Contributions to the Partnership:*

IIAPCO, Carver-Dodge, and Warrior were to contribute all of their rights under the contract with Pertamina. Indomar was to contribute $8,750,000, which was earmarked for payment to Reading & Bates for the costs of exploratory drilling under a turnkey drilling contract ($8,570,000 of that was paid in 1970).

(3) *Tax Allocations*

All deductions and credits were to be allocated to the partners in the same proportions that they contributed to the expenditures that created the deductions and credits. Indomar was to receive a special allocation of the IDC resulting from its initial partnership contribution.

(4) *Drill or Drop Provisions*

(a) If oil or gas in commercial quantities was discovered in any of the exploratory drilling, partners could choose to invest additional cash in the ratio of their partnership interests for costs of completion and production. Any partner choosing not to contribute capital for such additional costs would drop its interest in income from the particular well and would not share in revenue from that well or the "block" surrounding the well site.

(b) Similarly, in the event of any drilling of "development" wells after the initial exploratory drilling, all partners would be entitled to participate in accordance with their percentage interests by contributing cash *pro rata* for drilling and completion of the additional well(s). Any partner choosing not to contribute to costs for a particular well would have no right to revenue from that well or the block surrounding the well site.

(5) *Liquidation Rights*

Upon liquidation of the partnership each partner would, essentially, receive an undivided interest in the properties of the partnership in accordance with its partnership interest, subject to whether it had chosen to invest in a particular well under the drill or drop provisions.

Eight wells were drilled under the Reading & Bates drilling contract, all in 1970. No oil or gas in commercial quantities was discovered in those wells. IIAPCO proposed the drilling of five development wells through the remainder of 1970; the Souex partners would fund the project in proportion to their partnership interests. While Dillon was canvassing the Indomar partners about this proposal and continued participation in Souex, the first of these wells was drilled and oil in commercial quantities was discovered on September 16, 1970. With the news of that discovery, Indomar chose to invest in that well, and continued to participate in Souex. Income was derived by production from this well after 1970.

Souex claimed the $8,570,000 paid in 1970 to Reading & Bates under the initial drilling project as partnership IDC and dry hole costs, and made a special allocation of the deduction to Indomar. Indomar then allocated the IDC deduction to its partners, who deducted their proportionate shares on their income tax returns. The Shepherd

partnership allocated $10,180.27 to plaintiff Allison, who claimed the costs as a deduction on his 1970 return. After examination of Allison's 1970 return, the IRS disallowed most of the IDC deduction and required additional tax payments plus deficiency interest, based on its position that $8,570,000 of the IDC paid by Souex in 1970 should be allocated to Indomar only to the extent of Indomar's 13.5417 percent interest in Souex. The IRS disallowed Allison's subsequent claims for refund of the additional amount, and this litigation followed.

## II

The trial judge correctly identified section 704 of the 1954 Internal Revenue Code[4] as the controlling provision, which provided in subsection (a) that a partner's "distributive share of income, gain, loss, deduction, or credit shall be determined by the partnership agreement" unless—as provided by subsection (b)—"the principal purpose" of the provision for special allocation was "the avoidance or evasion of any tax." If the principal purpose is found to have been tax avoidance, the allocation provision is disregarded and the deduction is allocated according to the partners' distributive shares.

Citing *Orrisch v. Commissioner,* 55 T.C. 395, 401 (1970), *aff'd per curiam,* 31 A.F.T. R.2d 1069 (9th Cir.1973) to the effect that determination of the viability of the provision for special allocation to Indomar requires consideration of all the facts and circumstances relating to that provision, the trial judge concluded in plaintiff's favor that: (1) The principal purpose of the provision for special allocation to Indomar was the "business objective" of inducing invest-

ment for the exploratory drilling, although providing tax benefits for investors was one purpose of the allocation. (2) Without the full IDC allocation provision, which was customary in the oil and gas industry, the partners in Indomar would have been unwilling to invest in this high risk venture. (3) A particular deduction may be allocated in a partnership to the partner who bears the economic burden of the expenditure underlying the deduction. *Lewis v. Commissioner,* 65 T.C. 625, 632–33 (1975); *Boynton v. Commissioner,* 649 F.2d 1168, 1172 (5th Cir.1981), *cert. denied,* 454 U.S. 1146, 102 S.Ct. 1009, 71 L.Ed.2d 299 (1982). In this instance, Indomar bore the entire economic burden of the drilling costs. While it is true that Indomar received a 13.5417 percent interest in Souex for its $8,750,000 contribution, that contribution entitled Indomar to no future income from oil revenues absent additional contribution to Souex.

## III

Our decision to reverse the decision below rests on two factors: first, the trial judge emphasized an inappropriate standard in determining that the special allocation should be given effect for tax purposes, and, second, under the correct standard the allocation to Indomar is proscribed by section 704(b)(2).

■ There is no dispute that the viability of the special allocation is governed by section 704. The Government argues, and we agree, that even though at the time section 704(b)(2)'s proscription referred simply to the "principal purpose" of "tax avoidance", that determination is primarily a question of whether the provision for a special allo-

---

**4.** Section 704 reads in full:

"Section 704. Partner's distributive share

(a) Effect of partnership agreement.—A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this section, be determined by the partnership agreement.

(b) Distributive share determined by income or loss ratio.—A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss

of the partnership, as described in section 702(a)(9), for the taxable year, if—

(1) the partnership agreement does not provide as to the partner's distributive share of such item, or

(2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share of such item is the avoidance or evasion of any tax imposed by this subtitle."

26 U.S.C. § 704 (1970).

cation had "substantial economic effect." Plaintiff asserts, on the other hand, that the trial judge correctly emphasized the "business objective" underlying the allocation, and also claims that substantial economic effect is but one of several other factors to be considered. The uncertainty in this area arises from the fact that the applicable Treasury regulation associated with section 704(b)(2) listed, and continues to list, substantial economic effect as one of six factors for consideration in deciding whether tax avoidance was the principal purpose of an allocation in a partnership agreement:

> In determining whether the principal purpose of any provision in the partnership agreement for a special allocation is the avoidance or evasion of Federal income tax, the provision must be considered in relation to all the surrounding facts and circumstances. Among the relevant circumstances are the following: Whether the partnership or a partner individually has a business purpose for the allocation; *whether the allocation has "substantial economic effect", that is, whether the allocation may actually affect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences;* whether related items of income, gain, loss, deduction, or credit from the same sources are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation. * * * [Emphasis supplied.]

Treas.Reg. § 1.704–1(b)(2) (1964).

Furthermore, the trial judge properly noted that it was not until the Tax Reform Act of 1976, which does not directly cover this controversy, that the section 704(b)(2) language itself was changed to read that a special allocation provision will be disregarded if the allocation lacks substantial economic effect.

We think, however, that this change in language had minor substantive effect, at best, on the evaluation given special allocations by the courts which even before 1976 emphasized the existence of substantial economic effect over the other factors. *See, e.g., Hamilton v. United States,* 687 F.2d 408 (Ct.Cl.1982); *Magaziner v. Commissioner,* 37 T.C.M. (CCH) 873 (1978); *Harris v. Commissioner,* 61 T.C. 770 (1974); *Orrisch v. Commissioner,* 55 T.C. 395 (1970), *aff'd per curiam,* 31 A.F.T.R.2d 1069 (9th Cir.1973); *see also* Weidner, *Partnership Allocations and Capital Accounts Analysis,* 42 Ohio St. L.J. 466, 469 (1981); Kopple, *Allocations of Profits and Losses and Selected Basic Problems of Partnerships,* 27 Major Tax Planning 635, 638–39 (1975); McKee, Nelson & Whitmire, *Federal Taxation of Partnerships and Partners* 10–6, 10–11 (1977). In *Hamilton v. United States, supra,* a pre-1976 partnership allocation case covered by the 1954 Code, the Court of Claims, whose decisions are binding on this panel, *see South Corporation and Seal Fleet, Inc. v. United States,* 690 F.2d 1368 (Fed.Cir.1982), stated that substantial economic effect is

> the key factor to be considered in any analysis of the viability of a special allocation. An allocation that lacks "substantial economic effect" will not be saved by meeting the other five factors in the regulation, and it is unlikely that an allocation that has "substantial economic effect" would not also meet the other factors.

*Hamilton, supra,* 687 F.2d at 414.

Thus, the trial judge misplaced the emphasis in his analysis of the special allocation when he concluded that the principal purpose of that allocation was not tax avoidance but was the "business objective" of attracting investors to the drilling venture.[5] He did briefly discuss the alloca-

---

**5.** The opinion below cites *Orrisch v. Commissioner, supra,* 55 T.C. 395, for the proposition that "[i]f a special allocation has a *valid business purpose* apart from its tax consequences, it will ordinarily be given effect for tax purposes." (Emphasis added). But the actual language of *Orrisch* is different: "... special allocations are ordinarily to be recognized if they

tion's economic effect in his finding that Indomar bore the economic burden of the deduction underlying the allocation, but in our view did not afford that factor its significant role. Following the Court of Claims in *Hamilton,* we shall focus primarily on the question of the allocation's economic effect.

We do not doubt that Souex was in business for a valid purpose, that the three initial partners needed to attract risk capital for the exploratory drilling, that it was a common practice in the industry to grant the IDC allocation to the partners supplying the capital for drilling, or that a special allocation of IDC was in this instance the *sine qua non* for the Indomar partners' investment in Souex. But appellant does not contend that no such special allocations should ever be recognized for tax purposes. Rather, the Government maintains, and we agree, that without an appropriate adjustment—entirely absent here—in the Agreement's arrangement for dollar distributions from the partnership, the present allocation lacks substantial economic effect and is proscribed by section 704(b)(2). It is to that precise point we now turn.

## IV

### A.

■ Under the Treasury Regulation for section 704(b)(2), a special allocation has substantial economic effect if it "may actually affect the dollar amount of the partners' shares of the total partnership income and loss independently of tax consequences." Treas.Reg. § 1.704–1 (1964). We have found no decisions explicitly ruling on the viability under section 704(b)(2) of a

full IDC allocation to the cash partner in a drilling venture. One Revenue Ruling seems to condone such an arrangement "unless examination discloses that the principal purpose of the allocation is the avoidance or evasion of Federal income tax." Rev.Rul. 68–139, 1968–1 C.B. 311, 312. This is of no use here because it begs the question before us—appellant, as we have said, does not claim that all such arrangements are invalid, but only that this particular allocation to Indomar fails to withstand examination. *Cf. Willis, Partnership Taxation* 313–316 (2d ed. 1976) (the Revenue Ruling is ambiguous in not dealing with the crucial question of what constitutes tax avoidance).

The Tax Court has reviewed special allocations under section 704(b)(2) of items other than IDC; the legal standard employed by that court was summarized in *Magaziner v. Commissioner,* 37 T.C.M. (CCH) 873, 875 (1978):

> [T]he partner who benefits from a special allocation must bear the entire economic cost (burden) of such deductions. Accordingly, if an item of income or deduction to a partner is reflected in his capital account and the liquidation proceeds of the entity are distributed in accordance with the capital accounts, the allocation has substantial economic effect. Additionally, if property that has been the subject of a special allocation deduction is sold at a gain and the partnership agreement provides for a gain charge back provision [6], to find whether there is any economic effect of the special allocation aside from its tax consequences, "we must * * * look to see who is to bear the economic burden of the * * * deductions if the partnership property is sold for a

have *business validity* apart from their tax consequences." *Orrisch, supra,* 55 T.C. at 401 (emphasis added). Whether an allocation has "business validity" is not necessarily the same as whether it was adopted for a "valid business purpose." In assessing the former we must determine the economic effect of the allocation. Dissecting a "valid business purpose," on the other hand, may not call for an analysis of economic effect, although it is not clear that a special allocation—or, for that matter, the business enterprise as a whole—can be considered

to have a valid business purpose if the allocation does not also have a substantial economic effect.

**6.** A "gain charge-back" provision in the Souex partnership Agreement would have provided that Indomar would have been charged with all, or substantially all, partnership profits until it had recouped the losses previously allocated to it. *See* McKee, Nelson & Whitmire, *Federal Taxation of Partnerships and Partners* 10–19 (1977).

sum less than its original cost and the partnership liquidated." *Orrisch v. Commissioner,* [55 T.C. 395, 403 (1970), *aff'd per curiam,* 31 A.F.T.R.2d 1069 (9th Cir. 1973)].

A comparable analysis of the partnership capital accounts (we shall refer to it as "capital accounts analysis") was also adopted recently by the Court of Claims in *Hamilton v. United States, supra:* "[T]he validity of an allocation is tested by examining the effect of the allocation on the capital accounts of the partners at liquidation." *Hamilton, supra,* 687 F.2d at 419. The court in *Hamilton* also quoted with approval from *Harris v. Commissioner,* 61 T.C. 770. (1974), in which the Tax Court allowed a loss allocation under § 704(b)(2) because the allocation was reflected in the capital accounts and the capital accounts dictated the partners' shares in the event of liquidation:

> The loss allocated to him was applied to reduce his capital account, and his share of the related items of future profits, losses, and proceeds in case of liquidation was reduced proportionately. Such an economic impact sharply distinguishes the instant situation from that which obtained in *Stanley C. Orrisch.*

*Harris,* 61 T.C. at 786.

*Orrisch, supra,* was the first case in which a court considered the viability of a special allocation under section 704(b)(2). The court invalidated for tax purposes an amendment to a partnership agreement allocating to Mr. and Mrs. Orrisch the full depreciation deduction allowable on two buildings owned by a partnership consisting of them and one other couple. The agreement also provided that gain on the sale of the partnership property would be charged back to the Orrischs' capital account to the extent of the amount of the depreciation allocation, and the remainder of any gain would be shared according to the partnership interests. The opinion found the allocation to lack substantial economic effect

because—although the capital accounts were to be adjusted for the gain charge-back purposes—those adjusted accounts were not to be used as the basis for distributions on liquidation, nor was there any provision requiring the Orrischs, in the event the buildings were sold at a gain less than the depreciation taken, to make up that difference to the partnership:

> Under normal accounting procedures, if the building were sold at a gain less than the amount of such disparity petitioners would either be required to contribute to the partnership a sum equal to the remaining deficit in their capital account after the gain on the sale had been added back or would be entitled to receive a proportionately smaller share of the partnership assets on liquidation. Based on the record as a whole, we do not think that the partners ever agreed to such an arrangement.... That being true, the special allocation does not "actually affect the dollar amount of the partners' share of the total partnership income or loss independently of tax consequences" within the meaning of the regulation . . . .

*Orrisch, supra,* 55 T.C. at 403–404.

### B.

In the light of these decisions, the terms of the Souex partnership Agreement show that the special allocation of IDC to Indomar had no economic effect aside from the tax consequences for the Indomar partners. In the first place, the Agreement contained no gain charge-back provision.[7] Though such provisions are customarily included in partnership agreements in which losses are specially allocated to the parties who provide the capital, *Magaziner v. Commissioner,* 37 T.C.M. (CCH) 873, 876 (1978), the absence of the clause is not by itself fatal to the issue of the allocation's economic effect. But the Agreement also included no stipulation that Indomar's share of partnership assets on liquidation was to be computed

---

**7.** Dillon testified that he tried to make such a deal, but "it wouldn't fly." No other details were given.

according to the capital accounts adjusted for the special allocation. The Agreement's reference to accounting states that "the books of the Partnership shall be kept in accordance with usual and customary accounting practices using the cash receipts and disbursements method of accounting with classifications appropriate for Federal income tax reporting purposes." In actual fact, the record seems to show that Indomar's capital account was adjusted, for tax accounting purposes, to reflect the amount of the special allocation.[8] But the crucial circumstance is that the Agreement contained no provision entitling Indomar to a proportionately smaller share of liquidation proceeds, calculated according to the adjusted capital accounts (as discussed in the cases cited above). Indomar would have been entitled to its 13.5417% share of the proceeds had the Souex partnership been forced to liquidate at the conclusion of the Reading & Bates drilling contract, regardless of the capital account balances at that time.[8a] Thus, the special allocation had nothing but a tax consequence; it could not affect the partners' dollar shares. The only circumstance in which a particular partner would have received less than his or its pro rata share of proceeds on liquidation would have been if that partner had chosen not to participate in drilling or developing a particular well after the exploratory phase of the drilling—and this would not have been an economic effect resulting from, or attributable to, the special allocation. The core fact remains that all partners were participants in the exploratory phase by virtue of their initial partnership contribu-

tions and nothing in the Agreement adjusted the liquidation rights relative to the amount of the special allocation.

Plaintiff relies on *Orrisch, supra,* in arguing that the critical question is not the relationship between capital account balances and distributions to partners, either on liquidation or by gain charge-back, but is "who would bear the economic burden of loss of the $8,750,000 if the drilling venture produced all dry holes?" This is an incorrect analysis by taxpayer. First, the Tax Court in *Orrisch* answered the question of burden by analyzing the partners' capital accounts. Second, even if there might be circumstances in which capital accounts analysis would fail to demonstrate an otherwise viable economic effect of an allocation,[9] plaintiff has not persuaded us that this is such a case.

We cannot agree, in this connection, that Indomar alone bore the burden because it alone paid the cash for the drilling costs and because the only means by which it could recoup this investment was by further contributions for drilling and developing wells under the drill or drop provisions in the Agreement. Although Indomar provided the cash for the exploratory drilling it clearly did not bear the entire economic burden of the drilling costs. The other Souex partners contributed the lease—without which there would have been no drilling—and gave up a percentage of the venture to Indomar rather than providing their own cash. Moreover, like Indomar, in the event of dry holes the other partners could have recouped the value of their initial con-

8. The record also shows, and plaintiff apparently admits, that these capital account balances were in certain regards incorrect. The Government argues that, in addition to other problems with the accounts, the entries should have reflected the market value—and not the cost basis—of each partner's contribution, in order to account truly for the impact of the special allocation. Although resolution of that problem might be required in deciding other tax questions, we have no need to resolve it in this case.

8a. In order to maintain its status as a partner, Indomar was required to make full and timely payments of its $8,750,000 contribution accord-

ing to a schedule of payments over a nine month period during 1970. Had it failed to do so, it would have withdrawn from the partnership and forfeited its interest.

9. Neither the 1954 Code nor the Treasury regulations specifically require a capital accounts analysis in determining the viability of a special allocation under section 704(b)(2). The legislative history of the 1976 Act does seem to contemplate its use. *See* Staff of the Joint Committee on Taxation, 94th Cong., 2d Sess., General Explanation of the Tax Reform Act of 1976 95 n. 6 (1976).

tribution by further contribution under the drill or drop provisions. The result is that the other partners did share the economic burden of the drilling costs, absent adjustments to the Agreement which would have shifted the entire burden to Indomar.[10] See ALI Fed. Income, Estate and Gift Tax Stat. (Tent.Draft No. 11, 1956).

Plaintiff attempts to buttress his argument on economic burden with the claim, sustained by the trial judge, that Indomar had no interest of any value in Souex in the absence of further contributions to the partnership. He insists that Indomar's initial cash contribution was nothing but an "entry ticket" into Souex which entitled it to the option of investing more in order to receive revenues, but which did not give Indomar an "interest" in Souex per se. We are supposed to believe that the magic moment at which Indomar would have gained a true percentage interest in Souex of any value was only upon an actual contribution according to the 13.5417 percentage interest under the drill or drop provisions, and not upon the initial contribution to the partnership. Even if that characterization were correct, the result here would not be different. Indomar received a tax benefit with the special allocation of the IDC. In order for that special allocation to be recognized, the allocation itself must have some possible effect on "the dollar amount of the partners' shares of the total partnership income and loss independently of tax consequences." 26 C.F.R. § 1.704–1, supra. The "fact" that Indomar received merely an "entry ticket" and not an interest—absent further investment—fails to explain how the allocation itself could have affected the partners' shares independently of the tax consequences.

In addition, we cannot accept plaintiff's interpretation of the Agreement. That Agreement does not provide that Indomar's

13.5417 percent interest in the Souex partnership—independent of Indomar's interest in revenues from a particular well—was conditional upon further contribution under a drill or drop provision. The initial contribution of the other partners, in which Indomar had an interest, was not valueless and Indomar would continue to hold that interest even though it may have refused to participate further. We fail, too, to see how the existence of the drill or drop provisions could have rendered the partnership interests granted in the Agreement valueless until the drill option was chosen and further contribution was made according to those interests. It could well be that the drill or drop provisions made the interest of each partner—aside from its exercise in a particular instance—more valuable because each partner was not bound by the vote of the partnership whether to invest in drilling or developing a particular well, but could use his or its own business judgment in reviewing the available data to decide whether to participate (as Indomar did in deciding to join the ninth well). In other words, Indomar's interest in Souex had value both because, like a stock option, of the flexibility inherent in its exercise and because of its potential value—merely as an interest—to third parties.[11]

Finally, plaintiff argues that even under a capital accounts analysis Indomar is entitled to the deduction because it was "out of pocket" for the $8,750,000, and its "profit sharing percentage, along with its interest in the property upon liquidation, was produced not by the initial $8,750,000 investment (for exploratory drilling) but, rather, by the ratio of the additional cash investment" under the drill or drop provision. Plaintiff offers no persuasive justification why these same "facts", discussed supra in our rejection of the economic burden argument, are any more viable in a capital

---

**10.** There is absolutely no showing, and no reason to believe, that Indomar's percentage share was reduced because of the tax advantage accruing to it (even if it were clear that such a reduction would meet the requirements of section 704(b)(2)).

**11.** Indeed, the record shows that at different times pieces of Indomar's interest were sold to third parties for large sums. For example, in April, 1970 a .63% interest in Souex was purchased for $345,000. In July, 1973, an approximately 3.5% interest was purchased for $10 million.

accounts analysis. The crucial question always is the effect of the special allocation on "the dollar amount of the partners' shares of the total partnership income and loss independently of tax consequences."

### V

We conclude that the principal purpose of the special allocation of IDC to Indomar in the Souex partnership Agreement was the avoidance of tax—that was the only economic impact of the allocation—and thus was properly disregarded by the IRS under section 704. Accordingly, we reverse the judgment of the court below, and reject plaintiff's bid for a refund of his taxes.

*Reversed.*