PNRC LIMITED PARTNERSHIP, PNRC CORPORATION, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
PNRC Ltd. Partnership v. Commissioner
Docket Nos. 13897-91, 13898-91, 13899-91, 13900-91
United States Tax Court
T.C. Memo 1993-335; 1993 Tax Ct. Memo LEXIS 338; 66 T.C.M. (CCH) 265; July 29, 1993, Filed *338 Decisions will be entered for respondent in docket Nos. 13897-91 and 13898-91. Because of respondent's concession with respect to Carlino's additional capital contribution in 1985, decisions will be entered under Rule 155 in docket Nos. 13899-91 and 13900-91. C, an individual, and P, a related corporation, formed a limited partnership to run a racetrack. The partnership agreement stated that 99 percent of the losses were to be allocated to the limited partner and 1 percent to the general partner. Profits were originally allocated 1 percent to the limited partner and 99 percent to the general partner, but the agreement was amended shortly thereafter to provide for a profits allocation of 60 percent to the general partner and 40 percent to the limited partner. The agreement provides that upon termination of the partnership, liquidation proceeds are to be distributed in accordance with the partners' interests in net profits. During all of the years at issue the partnership had net losses. Held: The allocation of 99 percent of the partnership's losses to the limited partner lacks substantial economic effect. The losses should be reallocated in accordance with the partners' interests *339 in the partnership, which in this case is their relative capital contributions to the partnership. For petitioner: Harvey N. Shapiro. For respondent: Linda S. Bednarz. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Respondent issued petitioner a notice of final partnership administrative adjustment (FPAA) on behalf of PNRC Limited Partnership (PNRC LP) asserting that its losses for the taxable years 1983, 1984, 1985, and 1986 were disproportionately distributed between the general partner and the limited partner. [1] *340 This case is before the Court pursuant to petitioner's petition under section 6226 [2] for readjustment of the partnership items set forth in the FPAA. The issue for decision is whether petitioner's allocation of its losses 99 percent to the limited partner and 1 percent to the general partner has substantial economic effect. We find for respondent and hold that the partnership's losses must be reallocated in accordance with the partner's interests in the partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Petitioner, PNRC Corporation (PNRC), is the tax matters partner of PNRC LP. [3]
PNRC LP is a partnership between Peter D. Carlino (Carlino) as limited partner and PNRC as general partner. Carlino organized both PNRC and PNRC LP in December 1982 as part of the transaction described below. During the years at issue, PNRC was wholly owned by the Carlino Family Partnership (CFP), a limited partnership *341 controlled by Carlino and his family. CFP was formed under the Uniform Limited Partnership Act of Pennsylvania. Throughout the years at issue, CFP was owned 4 percent by Carlino as general partner, 8 percent by his wife as a limited partner, and 88 percent by their eight children, each owning an 11 percent limited partnership interest. Carlino is a successful businessman [4] who has been involved in various racetrack businesses from the late 1960s to the years at issue. Penn National Race Course (Penn National) is a thoroughbred racetrack located in Grantville, Pennsylvania. From 1972 to 1982, Carlino leased Penn National, through an entity known as the Mountainview Thoroughbred Racing Association (Mountainview). [5]Carlino offered to renew the lease but the principals of Penn National asked Carlino to buy the racetrack, which he agreed to do if he could find financing. Prior to purchasing Penn National, Carlino knew it had a history of losses *342 but he had made a profit there for the 10 years of the lease. Carlino was interested in buying Penn National so that he would continue to have a place to run his races. He believed that the debt on Penn National needed to be restructured in order to enable the racetrack to become profitable. On October 25, 1982, Carlino in his individual capacity entered into an agreement to purchase Penn National from Pennsylvania National Turf Club, Inc. *343 (Turf Club), which, in part, would require Carlino to assume an $ 8,000,000 mortgage from First Pennsylvania National Bank, N.A. (First Pennsylvania). [6] This agreement was never concluded. On December 30, 1982, Carlino assigned to Dauphin County Industrial Development Authority, a body politic and corporate (Dauphin County IDA), his right to purchase Penn National under the October 25, 1982 agreement. [7] *344 On the same day, Dauphin County IDA purchased Penn National from Turf Club, and assumed liability on the $ 8,000,000 mortgage with First Pennsylvania from Turf Club. [8]
On December 30, 1982, CFP and PNRC LP, the newly organized partnership (Buyers), [9] entered into an installment agreement with Dauphin County IDA (Seller) whereby Buyers agreed to purchase Penn National from Seller for $ 9,970,000, part of which consideration was assumption of the $ 8,000,000 mortgage from First Pennsylvania. [10] *345 In connection with the installment sale, the following persons and entities signed a Guaranty Agreement on the $ 8,000,000 mortgage with First Pennsylvania: Carlino, his wife, CF, Peter D. Carlino & Associates, Inc., [11] PNRC, and Mountainview. On December 30, 1982, PNRC LP and CFP (Lessors) entered into two leases with Turf Club and Mountainview (Lessees) whereby: (1) Lessees agreed to share the operation of and conduct races at Penn National, and (2) Mountainview leased from Lessors certain Penn National facilities to use in connection with the races. On the same day, Lessors assigned their rights in these leases to Dauphin County IDA as additional collateral for their obligations. The PNRC LP partnership agreement (the Agreement) allocates losses 1 percent to the general partner, PNRC, and 99 percent to the limited partner, Carlino. The original Agreement allocated profits 99 percent to the general partner and 1 percent to the limited partner. The Agreement was amended 3 days later, on December 31, 1982, to provide for an allocation of 60 percent of any profits to the general partner and 40 percent to the limited partner. The Agreement does not reflect the parties' capital contributions. The Agreement further provides *346 that upon termination of the partnership, the general partner shall either sell the partnership's assets and distribute the net proceeds or distribute the partnership property to the partners in proportion to their percentage interests. The Agreement provides that any reference to a partner's percentage interest is to his interest in net profits. PNRC LP sustained losses in all of the years at issue, which it allocated as follows: General Partner --
Limited Partner --
PNRC Corporation Peter Carlino
Year
Loss
1% 99%
1983
($ 194,355)
($ 1,944)
($ 192,411)
1984
($ 831,909)
($ 8,319)
($ 823,590)
1985
($ 227,431)
($ 2,274)
($ 225,157)
1986
($ 526,976)
($ 5,270)
($ 521,706)
PNRC LP was initially capitalized with $ 420,000. The partnership information returns and financial statements for 1982 and 1983 reflect that the general partner, PNRC, contributed $ 300,000 (71.4 percent of the initial capital) and the limited partner, Carlino, contributed $ 120,000 (28.6 percent of the initial capital). [12]Carlino loaned the partnership $ 358,346 in 1984. This loan was reclassified on the books of the partnership as additional capital. Because of this additional capital *347 contribution, the partnership's capital for 1985 and 1986 was allocable 38.6 percent to PNRC and 61.4 percent to Carlino. Respondent reallocated the losses on the basis of the capital ownership of each of the partners, as follows: General Partner --
Limited Partner --
Year
PNRC Corporation
Peter Carlino
1983
71.4%
28.6%
1984
71.4%
28.6%
1985
38.6%
61.4%
1986
38.6%
61.4%
OPINION Although the facts of this case are complicated, the issue for decision is straightforward: Did the allocation of 99 percent of the losses of PNRC LP to Carlino, the limited partner, have substantial economic *348 effect? The record illustrates that Carlino had a longtime interest in horseracing and probably would not have entered into the transaction at issue if the principals of Penn National had accepted his offer to renew their lease. However, they did not accept the offer, and Carlino chose to engage in the purchase and lease transaction described above. We turn to the issue of whether the partnership's loss allocations can stand. Section 704(a) generally provides that a partner's distributive share of any item of income, gain, loss, deduction, or credit is determined by the partnership agreement. Section 704(b) provides that a partner's share of any such item is determined according to the partner's interest in the partnership, taking into account all the facts and circumstances, if the allocation of the item under the partnership agreement does not have "substantial economic effect". Sec. 704(b). Section 1.704-1(b), Income Tax Regs., provides a process for determining if an allocation has "substantial economic effect". The current version of this paragraph is effective for taxable years beginning after December 31, 1975. Sec. 1.704-1(b)(1)(ii), Income Tax Regs. However, for *349 partnership taxable years beginning after December 31, 1975, but before May 1, 1986, an allocation that is not otherwise respected under this paragraph of the regulations will nevertheless be respected under section 704(b) if the allocation has substantial economic effect or is in accordance with the partners' interests in the partnership as these terms have been interpreted under the relevant case law, the legislative history of the applicable section of the Tax Reform Act of 1976, and the applicable provisions of the regulations under section 704(b) that were in effect for taxable years beginning before May 1, 1986. Id. Thus, before turning to the prior version of the regulation, this Court must determine whether the partners' allocation of losses has substantial economic effect under the current version. To have substantial economic effect, the allocation must have "economic effect" and such economic effect must be "substantial". Sec. 1.704-1(b)(2)(i), Income Tax Regs.[13] In order to have economic effect under the basic test, the partnership agreement must provide, throughout the full term of the partnership: (1) For the determination and maintenance of the partners' capital *350 accounts in accordance with the provisions of section 1.704-1(b)(2)(iv), Income Tax Regs.; (2) that upon liquidation of the partnership, all liquidating distributions must be made in accordance with the positive capital account balances of the partners; and (3) that if a partner has a deficit balance in his capital account following liquidation of his interest in the partnership, he is unconditionally obligated to restore the amount of this deficit balance by the end of the taxable year or within 90 days after the date of such liquidation, whichever is later. Sec. 1.704-1(b)(2)(ii)(b), Income Tax Regs. The Agreement does not have these provisions. In fact, the Agreement expressly provides that the general partner shall never be obligated to pay the limited partner or the partnership the amount of any deficit in its capital account. Thus, the allocation does not pass the basic test for economic effect. *351 The regulation also provides an alternate test for economic effect, contingent on satisfaction of items (1) and (2) above, which PNRC LP does not satisfy. [14]Sec. 1.701-1(b)(2)(ii)(d), Income Tax Regs. Thus, the loss allocation fails the alternate test for economic effect. Allocations that lack economic effect under the provisions discussed above may nevertheless be deemed to have economic effect if, as of the end of each taxable year, a liquidation of the partnership would produce the same economic results to the *352 partners as if the requirements of the basic test for economic effect were met, regardless of the performance of the partnership. Sec. 1.704-1(b)(2)(ii)(i), Income Tax Regs. Because the Agreement provides that upon termination of the partnership, partnership property will be distributed to the partners in proportion to their interests in net profits, that is, 60 percent to the general partner and 40 percent to the limited partner, even a liquidation after one year of operation would not produce the same results to the partners as if the Agreement met the basic test for economic effect. That is, partly because the general partner contributed 71.4 percent of the initial capital and the limited partner contributed 28.6 percent, liquidating distributions to each partner will not equal the balance each has in his capital account. Thus, the allocation fails this "economic effect equivalence" test as well. Although the allocation lacks substantial economic effect under the current regulation, [15] the next question is whether the allocation has substantial economic effect under the provisions of the applicable paragraph of the regulation in effect for taxable years beginning before *353 May 1, 1986, the relevant case law, and the relevant legislative history of the Tax Reform Act of 1976. Sec. 1.704-1(b)(1)(ii), Income Tax Regs.[16]
The Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1548, *354 first codified the "substantial economic effect" test, formerly a factor in the applicable regulation. Ogden v. Commissioner, 788 F.2d 252, 260 (5th Cir. 1986), affg. 84 T.C. 871 (1985). [17]The Joint Committee Explanation of the change provides: The Act provides that an allocation of overall income or loss * * *, or of any item of income, gain, loss, deduction, or credit * * *, shall be controlled by the partnership agreement if the partner receiving the allocation can demonstrate that it has "substantial economic effect," i.e., whether the allocation may actually affect the dollar amount of the partner's share of the total partnership income or loss independent of tax consequences.
Staff of Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 107; see also id. at 107 n.6. Thus, petitioner bears the burden of proving that the loss allocation has substantial economic effect. Id.; McGuffey v. Commissioner, T.C. Memo. 1989-267. *355 Guided by this explanation, the courts developed a "capital accounts analysis" to determine whether an allocation had substantial economic effect. Under this analysis, a partner's allocation must be reflected in his capital account, which must govern distributions in liquidation, and any partner whose capital account reflects a deficit must have an obligation to restore the amount of the deficit. Ogden v. Commissioner, supra at 261; Allison v. United States, 701 F.2d 933, 939 (Fed. Cir. 1983); Goldfine v. Commissioner, 80 T.C. 843, 852-853 (1983). Where a partner does not have the obligation to restore any deficit in his capital account upon liquidation, the other partner or partners would bear part of the economic cost of the allocations that caused the deficit. Ogden v. Commissioner, supra at 261; Elrod v. Commissioner, 87 T.C. 1046, 1084 (1986); Orrisch v. Commissioner, 55 T.C. 395, 403-404 (1970), affd. per curiam 31 AFTR 2d. 1069 (9th Cir. 1973). In the *356 instant case, liquidation proceeds were not required to be distributed in accordance with capital account balances. Rather, distributions were to be made in accordance with each partner's interest in net profits. Because each partner's interest in profits differed substantially from his interest in losses, and the partnership sustained losses in all the years at issue, the capital accounts would reflect numbers very different from the amount of any distribution in liquidation. In addition, as discussed above, it appears that in this case neither partner has an obligation to restore a capital account deficit. Petitioner argues that Carlino's guarantee of the $ 8,000,000 mortgage held by First Pennsylvania and then by Fidelity Bank provides him with the economic risk of loss. We disagree. First, the creditors could look to the racetrack itself for satisfaction of the liability. Second, if that did not satisfy the liability, Carlino is only one of five co-guarantors; there is no assurance that he, rather than someone else, would have paid off the mortgage if necessary. Third, the debtors were not insolvent during any of the years at issue. A guarantor may not be ultimately liable *357 on a debt he guarantees absent insolvency of the debtor. Goldfine v. Commissioner, 80 T.C. 843, 854 (1983). Fourth, the key issue in this case is whether Carlino had an obligation to restore a negative capital account balance on liquidation, not whether Carlino ultimately may pay the mortgage. Petitioner has cited no authority to support his novel proposition that a guarantee of a liability creates substantial economic effect where economic effect is otherwise lacking. In Allison, 701 F.2d at 940, the taxpayer made a similar "economic burden" argument. The Court of Appeals for the Federal Circuit rejected this argument "that the critical question is not the relationship between capital account balances and distributions to partners * * * but is 'who would bear the economic burden of loss * * * if the drilling venture produced all dry holes?'" Allison v. United States, supra at 940. The court stated, "This is an incorrect analysis by taxpayer." Id. The court later specified that, under the capital accounts analysis, "The crucial question always is the effect of the special allocation *358 on 'the dollar amount of the partners' shares of the total partnership income and loss independently of tax consequences.'" Id. at 941. We have considered petitioner's other arguments and find them similarly to be without merit. Thus, the allocation of 99 percent of PNRC LP's losses to Carlino lacks substantial economic effect. Accordingly, section 704(b) requires the losses to be reallocated in accordance with the partners' respective interests in the partnership. This is a facts and circumstances inquiry. Among the factors to consider in determining the partners' interests in a partnership are the partners' relative contributions to the partnership, their respective interests in profits and losses, if different from taxable income and loss, cash flow, and their distribution rights upon liquidation. Ogden v. Commissioner, supra at 264; sec. 1.704-1(b)(3)(ii), Income Tax Regs.; Joint Committee Explanation, supra at 108; 2 Willis, Pennell & Postlewaite, Partnership Taxation, sec. 103.03, at 103-5 (4th ed. 1993). In this case, the partners' contributions to the partnership are the most indicative of their interests *359 in the partnership. [18] Thus, the losses should be allocated as follows: General Partner --
Limited Partner --
Year
PNRC Corporation
Peter Carlino
1983
71.4%
28.6%
1984
71.4%
28.6%
1985
38.6%
61.4%
1986
38.6%
61.4%
*360 To reflect the foregoing, Decisions will be entered for respondent in docket Nos. 13897-91 and 13898-91. Because of respondent's concession with respect to Carlino's additional capital contribution in 1985, decisions will be entered under Rule 155 in docket Nos. 13899-91 and 13900-91. Footnotes
1. Docket No. 13897-91 relates to the taxable year ended December 31, 1983. Docket No. 13898-91 relates to the taxable year ended December 31, 1984. Docket No. 13899-91 relates to the taxable year ended December 31, 1985. Docket No. 13900-91 relates to the taxable year ended December 31, 1986. These cases were consolidated for briefing and trial under Rule 141, pursuant to respondent's motion. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.↩
3. The parties stipulated that the corporate residence of the tax matters partner at the time the petition was filed was Grantville, Pennsylvania. We find that this is also the location of the partnership's principal place of business. See sec. 7482(b)(1)(E).↩
4. In 1982, Carlino had a net worth of approximately $ 15,000,000.↩
5. During the years at issue, Mountainview was a corporation owned 90 percent by the Carlino Financial Corporation (CF) and 10 percent by Thomas Gorman, an individual. During the years at issue, CF was a corporation owned 94 percent by PDC Partnership, a limited partnership formed under the Uniform Limited Partnership Act of Pennsylvania, and 6 percent by a son of Carlino. PDC Partnership was owned 4 percent by Carlino as general partner, 8 percent by his wife, as a limited partner, and 88 percent by their eight children, each owning an 11 percent limited partnership interest.↩
6. The agreement with Turf Club was to purchase for $ 9,746,841 certain real estate and other assets in Grantville, Pennsylvania, at which Penn National was operated. Carlino agreed to pay $ 1,346,841 in cash, to assume a $ 400,000 liability, and to assume the $ 8,000,000 mortgage from First Pennsylvania. Turf Club was a publicly owned corporation until 1986 when it was acquired by CG Associates, Corp., a corporation owned 80 percent by Carlino.↩
7. He assigned to CFP any rights under that agreement other than the rights to purchase real estate and tangible personal property.↩
8. Dauphin County IDA's liability on the mortgage was limited to its interest in (including rents, issue, and profits of) the property acquired.↩
9. Carlino's business purpose for having two entities purchase Penn National was to separate ownership of that portion of the land not used by the racetrack so that it could be developed without approval of the Racing Commission.↩
10. Buyers' payment of the purchase price was made through their agreement to assume liability on the $ 8,000,000 mortgage with First Pennsylvania, to assume liability on $ 1,150,000 in notes payable to Harry M. Stevens, Inc. of Penn (Stevens), to assume liability on a $ 400,000 note payable to Hamilton Bank, and to pay $ 420,000 in cash. The agreement was amended on May 15, 1984, to reflect Fidelity Bank's purchase of the $ 8,000,000 mortgage from First Pennsylvania. In connection with the installment agreement, Mountainview, CFP, and PNRC LP signed two agreements assuming liability on the $ 1,150,000 in notes payable to Stevens. Also in connection with the sale, Carlino and his wife, individually and as husband and wife, and Mountainview assumed liability and became indemnitors on the $ 400,000 note payable to Hamilton Bank. The amounts due and owing on these liabilities at the end of each year in issue were as follows: ↩
12/31/83 12/31/84 12/31/85 12/31/86 Dauphin County
$ 7,712,030
$ 7,704,150
$ 7,490,522
$ 7,368,156
IDA & First
Pennsylvania
(after 5/15/84:
Fidelity Bank)
Hamilton Bank
376,667
340,000
300,000
260,000
Harry M.
920,000
805,000
1,000,000
925,000
Stevens, Inc.
11. During the years at issue, Peter D. Carlino & Associates, Inc., was a corporation owned 100 percent by CF.↩
12. Petitioner apparently argues that the $ 300,000 which was represented on tax returns as contributed to PNRC LP by PNRC was actually contributed by Carlino personally because he wrote the checks as part of the purchase transaction. The record is not entirely clear on the source of the initial capital contributions to PNRC LP. However, we conclude that PNRC contributed the $ 300,000, its initial capital, to PNRC LP.↩
13. Different rules may apply to allocations attributable to nonrecourse deductions. PNRC LP treated all its outstanding debt obligations as recourse, and as respondent conceded this issue in her briefs, we assume no loss allocations in issue are attributable to nonrecourse debt.↩
14. In addition, the agreement must contain a "qualified income offset" provision. A "qualified income offset" is where a partnership agreement provides that a partner who unexpectedly receives certain adjustments, allocations, or distributions will be allocated items of income and gain in an amount and manner so as to eliminate his deficit balance as quickly as possible. Sec. 1.704-1(b)(2)(ii)(d), Income Tax Regs.↩ The PNRC LP agreement does not contain a qualified income offset provision.
15. If an allocation has economic effect, the economic effect must also be "substantial". In general, an allocation is not substantial if, at the time the allocation becomes part of the partnership agreement, the allocation enhances the after-tax economic consequences of at least one partner and there is a strong likelihood that the allocation will not diminish the after-tax economic consequences to any partner. Sec. 1.704-1(b)(2)(iii), Income Tax Regs.↩ In the present case, Carlino had substantial income in the years at issue and stood to obtain a tax benefit from the allocation of the losses to him, whereas PNRC did not.
16. The taxable years at issue ended December 31, 1983; December 31, 1984; December 31, 1985; and December 31, 1986. Thus, all taxable years in issue began before May 1, 1986.↩
17. Prior to amendment, sec. 704(b) read as follows: A partner's distributive share of any item of income, gain, loss, deduction, or credit shall be determined in accordance with his distributive share of taxable income or loss of the partnership, as described in section 702(a)(9), for the taxable year, if -- (1) the partnership agreement does not provide as to the partner's distributive share of such item, or (2) the principal purpose of any provision in the partnership agreement with respect to the partner's distributive share is the avoidance or evasion of any tax imposed by this subtitle.
The regulation under this section provided that the substantial economic effect of the allocation was a factor in the determination of whether the principal purpose of the allocation was the avoidance or evasion of tax. The courts focused on substantial economic effect as the key factor in the determination. See, e.g., Orrisch v. Commissioner, 55 T.C. 395 (1970), affd. per curiam, 31 AFTR 2d 1069↩ (9th Cir. 1973).
18. We recognize that there are other possible ways to determine the partners' interests in the partnership. One such approach would be to compare (1) the manner in which distributions and contributions would be made if all partnership property were sold at book value and the partnership were liquidated at the end of the taxable year at issue with (2) the manner in which such distributions or contributions would be made if all partnership property were sold at book value and the partnership were liquidated at the end of the prior taxable year, adjusting for certain items. See Sec. 1.704-1(b)(3)(iii), Income Tax Regs.↩ (mandatory in the limited case where the sole reason a partnership fails the basic test for economic effect is because it lacks a deficit makeup obligation). Neither party raised this approach and we do not consider it.